[No. G041887. Fourth Dist., Div. Three. Oct. 4, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSE JUVENAL CAMINO, Defendant and Appellant.

[No. G042933. Fourth Dist., Div. Three. Oct. 4, 2010.]

In re JOSE JUVENAL CAMINO on Habeas Corpus.

1360

1362

## COUNSEL

Patricia J. Ulibarri, under appointment by the Court of Appeal, for Defendant and Appellant and for Petitioner.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Robin Derman and Theodore M. Cropley, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**IKOLA, J.**—Defendant Jose Juvenal Camino and his fellow gang member, Rolando Palacios, were involved in a gunfight with a rival gang on September 30, 2007. Palacios, the lone shooter in defendant's group, was shot and killed by a bullet of unknown origin.

Hours later, officers interviewed defendant at the police station without reading him his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda*). During the interview, defendant revealed, inter alia, that he, Palacios, and a third companion had driven in an alley in pursuit of rival gang members and that Palacios had stepped out of the car and shot at their rivals. After this first interview, the officers gave defendant a short break. Then they moved him to a different room, advised him of his *Miranda* rights, and interviewed him a second time. Defendant related the same events he had described in his first interview.

Defendant was subsequently tried pursuant to the provocative act murder doctrine (under which a "person can be guilty of murder . . . even if someone else did the actual killing") for the homicide of Palacios. (CALCRIM No. 561.) At trial, the People conceded that defendant's statements in his first interview were inadmissible, but introduced into evidence, over defendant's objection, statements from his second interview. The jury convicted defendant of the second degree murder of Palacios (count 1; Pen. Code, § 187, subd. (a)),[1] and found he vicariously discharged a firearm within the meaning of section 12022.53, subdivisions (c) and (e)(1), an enhancement that carries a mandatory consecutive prison term of 20 years.[2]

In midstream *Miranda* cases (where a defendant is interviewed before and after the giving of *Miranda* warnings), a defendant's postwarning inculpatory

---

[1] All statutory references are to the Penal Code unless otherwise stated.

[2] The jury also convicted defendant of the attempted murder of a rival gang member, Adolfo Rodriguez (count 2; §§ 187, subd. (a), 664, subd. (a)), and street terrorism (count 3; § 186.22, subd. (a)). The jury found defendant committed both the murder of Palacios and attempted

statements are generally admissible if the prewarning statements *and* the postwarning statements were voluntarily made. (*Oregon v. Elstad* (1985) 470 U.S. 298, 318 [84 L.Ed.2d 222, 105 S.Ct. 1285] (*Elstad*).) But where law enforcement uses a two-step interrogation technique "in a calculated way to undermine the *Miranda* warning," curative measures must be taken to ensure that a reasonable person would understand the *Miranda* advisement and the significance of waiving *Miranda* rights. (*Missouri v. Seibert* (2004) 542 U.S. 600, 622 [159 L.Ed.2d 643, 124 S.Ct. 2601] (*Seibert*).) Here, the court concluded that the interrogating officers did not deliberately use a two-step process to circumvent *Miranda*.

We hold the court's conclusion is a factual finding subject to the substantial evidence standard of review, and as such, is supported by the evidence in this case. We also hold defendant's trial counsel did not render ineffective assistance by failing to "urge" the court to review the transcript of his second police interview before ruling on its admissibility. Finally, we find insufficient evidence to support the jury's finding defendant vicariously discharged a gun in Palacios's murder, because Palacios, as the lone shooter (and the only armed person) in defendant's group, could not be a principal in his own murder.

## FACTS

*Evidence Taken from Defendant's Second Police Interview*

At trial, Corporal David Rondou testified to the following information divulged by defendant during the second interview.

Defendant is a former Hard Times gang member with the moniker, "Tiny." On the night of the shooting, he went "bar hopping" with his nephew, Miguel Martinez. Later, with Martinez driving a white Chevy Camaro, they drove into the neighborhood claimed by Hard Times. There, they saw Palacios, whom defendant recognized as a Hard Times gang member.

The Camaro pulled up to Palacios. Palacios, not knowing defendant or Martinez, reached in his waistband for his gun. Defendant introduced himself

---

murder of Rodriguez for the benefit of a gang within the meaning of section 186.22, subdivision (b)(1), and vicariously discharged a firearm within the meaning of section 12022.53, subdivisions (c) and (e)(1), as to both counts.

The court sentenced defendant to a total prison term of 60 years to life, as follows. On count 1, the court sentenced defendant to prison for 15 years to life, plus 20 years for the firearm enhancement, but struck the gang enhancement. On count 2, the court sentenced defendant to prison for the low term of five years, along with 20 years for the firearm enhancement, but struck the gang enhancement. On count 3, the court imposed the midterm of two years, but stayed the sentence pursuant to section 654.

to Palacios, saying he (defendant) used to "kick it" with Palacios's brother, another Hard Times gang member. Defendant told Palacios that Martinez was "Flaco" of the Lil Hood gang. Palacios got in the back seat of the Camaro and later displayed a .40-caliber handgun.

After drinking "a little bit," the threesome decided to drive to the neighborhood claimed by Lil Hood. There, they went to a small strip mall comprised of a 7-Eleven store and a laundromat. Defendant knew that, although the Lil Hood gang claimed this territory, the Barrio Small Town gang (BST) had been trying to take it over and had marked it with graffiti.

Two to three months earlier, at this mall, defendant, Martinez, and another Lil Hood gang member had lost a fistfight against some BST members. Defendant had "back[ed] up" Martinez in that fight.

Now, Martinez parked the Camaro near the 7-Eleven store and the threesome stood there drinking. From around the corner came three BST members, one of whom had been involved in the prior fistfight. Defendant knew that these BST "guys" lived in a house "three or four [houses] down" the alley.

Martinez walked toward the BST members, "throwing his hands up . . . in a 'what's up' kind of deal." Defendant backed up Martinez by walking with him, thinking there would be "a physical altercation."

From behind them, Palacios fired his gun twice. The BST members ran back down the alley. Palacios said words like, "Let's go get them, let's go shoot them again." They got in the Camaro with Martinez driving, Palacios in the front passenger seat, and defendant in the back.

The Camaro drove into the alley. Martinez asked, "Where are they?" and turned off the car's headlights.

Palacios got out of the car, stood by the door, and started shooting. Martinez started to get out too, but retreated into the car at the sound of return gunfire. The Camaro backed out of the alley, leaving Palacios behind, alone on foot. Martinez and defendant circled the block, whistling and trying to find Palacios. After a couple of loops, they found him lying in a driveway. As Martinez started to get out of the Camaro, they heard sirens. Martinez jumped back in the Camaro, and he and defendant tried to flee the scene.

*Other Evidence*

A police officer dispatched to the scene at around 3:00 a.m. came upon a white Camaro suspiciously stopped in the middle of the street with its

headlights off. The Camaro started to drive away with its lights still off. The officer initiated a "high risk" traffic stop. Martinez was the driver of the Camaro and defendant a passenger. No weapons were found on them or in the car.

On a driveway, Palacios lay facedown with a gun in his hand and no pulse. He had bled to death after a single bullet went into his left arm, through his chest, and out his right arm. About five bullet casings were found in the alley.

David, Adolfo, and Juanita Rodriguez[3] are siblings who reside in a house "butting up to the alley." At around 3:00 a.m., David (a 19-year-old BST member) heard about five gunshots. At trial, David first testified that, upon hearing the gunshots, he did *not* go out to the alley and furthermore that he had never seen the white Camaro before. But in his police interview on the day of the shooting, David said he was awakened by the sound of gunfire, went out into the alley, and saw a car drive down the alley. When pressed at trial about which story was accurate, David said he saw a white car in the alley that night. He had seen that car in the neighborhood several times before that night and knew it was associated with Lil Hood. According to David, BST is *not* friendly with Lil Hood, but is friendly with Hard Times. David saw a male in a white shirt with a handgun walking toward the Camaro. He saw the car back out of the alley.

On cross-examination, David said he heard a group of about three "piasas" (people from Mexico) throw beer bottles at the Camaro and the male shooter. David did not know whether one of the piasas might have been shooting a gun.

When pressed on redirect, David agreed he told police he saw two people outside the Camaro, one in a white shirt who got into the car and the other shooting a gun.

Adolfo, who was 16 years old at the time of trial, testified that at around 3:00 a.m. that day, a party had ended at his house. Adolfo and two friends went to the 7-Eleven store to buy cigarettes. They saw a white Camaro, heard shots, and "started running back." The shots came from the passenger side of the car. (In his police interview, Adolfo said the occupants of the car got out

---

[3] For brevity and to avoid confusion, we refer to members of the Rodriguez family by their first names (as opposed to Detective Julian Rodriguez, an unrelated police officer, whom we refer to by his last name). We mean no disrespect. David testified at trial in return for use immunity and the dismissal of his probation violation for possessing a gun while a gang member. Adolfo testified at trial in return for use immunity and the dismissal of his probation violation for vandalism.

and threw gang signs, and one fired at him. At trial, Adolfo could not recall which version was correct.) Adolfo had seen the car pass through the alley behind his house on three or four prior occasions and associated it with Lil Hood. The occupants of the white Camaro had "tried to jump" Adolfo less than a month before the shooting.

Juanita, who was a 27-year-old mother at the time of trial, had seen the white Camaro in her neighborhood many times. A tall, skinny male known as Flaco owned it. That night, there was a family reunion at their house. Juanita was awakened at 3:00 a.m. by gunshots. She saw the white Camaro driving out of the alley onto a nearby street. She threw some beer bottles at the car.

On a prior occasion, two males named Flaco and Tiny had come to the house and pointed a gun at Juanita in front of her daughters. The men had been looking for Juanita's brothers. One man said he was from Lil Hood, the other from Hard Times. She told them she did not "gang bang."

Juanita testified that the Lil Hood gang member drove the Camaro on the night of the shooting. She identified the two males in photo lineups three days after the shooting. In a police interview a few days after the shooting, Juanita identified Martinez as occupying the Camaro seconds after the homicide and on the day prior to the shooting. She identified defendant as occupying the car less than eight hours before the homicide. About 1:00 p.m., the day before the shooting, Juanita saw the car pass through her neighborhood several times. A couple of months earlier, her brother had been involved in a fight at the 7-Eleven store. Juanita had gone to the 7-Eleven store and confronted Martinez and defendant. Shortly after that, Martinez came to Juanita's house and continued the argument with Juanita.

A gang expert testified that the Lil Hood and BST gangs laid claim to the area where the crime occurred, with BST's claim based on the Rodriguez family being "well entrenched" in BST. Hard Times is associated with Lil Hood and therefore a rival of BST. The expert opined that, at the time of the crime, defendant and Palacios were active participants in Hard Times; Adolfo and Daniel in BST; and Martinez in Lil Hood. He opined that "hypothetically speaking," if Hard Times and Lil Hood gang members were beaten up by BST members in a fight, this would bring disrespect upon the Hard Times and Lil Hood gangs as well as upon the specific members involved in the fight. He further opined, hypothetically speaking, that if a couple of months later, several BST members were to walk up to two Hard Time members and one Lil Hood member, and one of the Hard Times members shot at the BST group, this would be an "act of retaliation."

## DISCUSSION

*The Court Did Not Err by Admitting into Evidence Defendant's Statements Made in His Second Police Interview*

On the day of the shooting, Rondou and Detective David Rodriguez interviewed defendant twice, the first time at 9:40 a.m. (without *Miranda* advisement), and the second time (with *Miranda* warnings) less than half an hour after the first. Defendant contends Rondou deliberately employed a two-step tactic of eliciting a confession from him before reading him his *Miranda* rights and then eliciting the same confession again, thereby violating his Fifth Amendment right against self-incrimination.

### 1. *The Law on Midstream* Miranda *Warnings*

"We apply federal standards in reviewing defendant's claim that the challenged statements were elicited from him in violation of *Miranda*." (*People v. Bradford* (1997) 14 Cal.4th 1005, 1032–1033 [60 Cal.Rptr.2d 225, 929 P.2d 544].) In *Elstad, supra*, 470 U.S. 298 and *Seibert, supra*, 542 U.S. 600, the United States Supreme Court discussed the admissibility of a defendant's inculpatory statements made before and after advisement of *Miranda* rights.

*Elstad* held that a suspect who responds "to unwarned yet uncoercive questioning" may later waive his rights and confess after being "given the requisite *Miranda* warnings." (*Elstad, supra*, 470 U.S. at p. 318.) If the suspect's unwarned statement was voluntary, the "relevant inquiry is whether, in fact, the second statement was also voluntarily made." (*Ibid.*) "As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements. The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative." (*Ibid.*) *Elstad* did *not*, however, "condone inherently coercive police tactics or methods offensive to due process that render the initial admission involuntary and undermine the suspect's will to invoke his rights once they are read to him." (*Id.* at p. 317.)[4]

In *Seibert*, an officer "testified that he made a 'conscious decision' to withhold *Miranda* warnings, thus resorting to an interrogation technique he had been taught: question first, then give the warnings, and then repeat the

---

[4] "When a prior statement is actually coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession." (*Elstad, supra*, 470 U.S. at p. 310.) Here, defendant does not argue that his prewarning statements were coerced.

question 'until I get the answer that she's already provided once.' " (*Seibert, supra*, 542 U.S. at pp. 605–606.) Employing this "question-first practice" (*id.* at p. 611), the interrogating officer left the defendant alone in an interview room at the police station for 15 to 20 minutes, then "questioned her without *Miranda* warnings for 30 to 40 minutes, squeezing her arm and repeating" a suggestive, accusatory remark (*id.* at pp. 604–605). After the defendant confessed and was given a 20-minute break, the officer read her the *Miranda* warnings, resumed the questioning by mentioning their previous conversation, "and confronted her with her prewarning statements." (*Siebert*, at p. 605.)

■ A divided Supreme Court held the defendant's postwarning statements were inadmissible. (*Seibert, supra*, 542 U.S. at pp. 617, 622.) Justice Souter's plurality opinion focused on whether "it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires" (*id.* at pp. 611–612), noting that the giving of midstream *Miranda* warnings "without expressly excepting the statement just given, could lead to an entirely reasonable inference that what [the accused] has just said will be used, with subsequent silence being of no avail" (*Siebert*, at p. 613).

Justice Kennedy's concurring opinion expressed his view that the plurality's test, which "envisions an objective inquiry from the perspective of the suspect, and applies in the case of both intentional and unintentional two-stage interrogations," was too broad. (*Seibert, supra*, 542 U.S. at pp. 621–622.) Justice Kennedy noted that in *Elstad*, "the postwarning statements could be introduced against the accused because 'neither the general goal of deterring improper police conduct nor the Fifth Amendment goal of assuring trustworthy evidence would be served by suppression' given the facts of that case." (*Siebert*, at pp. 619–620.) With these goals in mind, Justice Kennedy observed that a deliberate two-step technique intended to violate *Miranda* did "not serve any legitimate objectives" and presented inherent temptations for police abuse (such as the use of a defendant's prewarning statement to obtain an incriminating postwarning statement). (*Siebert*, at pp. 620–621.) Justice Kennedy concluded: "I would apply a narrower test applicable only in the infrequent case . . . in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." (*Id.* at p. 622.) "If the deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made. Curative measures should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver. For example, a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning may suffice in most

circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn. [Citations.] Alternatively, an additional warning that explains the likely inadmissibility of the prewarning custodial statement may be sufficient." (*Ibid.*) Because Justice Kennedy "concurred in the judgment[] on the narrowest grounds" (*Marks v. U.S.* (1977) 430 U.S. 188, 193 [51 L.Ed.2d 260, 97 S.Ct. 990]), his concurring opinion represents the *Seibert* holding.[5]

■ "Justice Kennedy did not articulate how a court should determine whether an interrogator used a deliberate two-step strategy." (*Williams, supra,* 435 F.3d at p. 1158, fn. omitted.) *Williams* suggested an answer to this question. In *Williams*'s view, "courts should consider whether objective evidence and any available subjective evidence, such as an officer's testimony, support an inference that the two-step interrogation procedure was used to undermine the *Miranda* warning." (*Ibid.,* fn. omitted.) "Such objective evidence would include the timing, setting and completeness of the prewarning interrogation, the continuity of police personnel and the overlapping content of the pre- and postwarning statements." (*Id.* at p. 1159.)

"In considering a claim that a statement or confession is inadmissible because it was obtained in violation of a defendant's rights under *Miranda* . . . , the scope of our review is well established. 'We must accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if they are substantially supported. [Citations.] However, we must independently determine from the undisputed facts, and those properly found by the trial court, whether the challenged statement was illegally obtained.' " (*People v. Bradford, supra,* 14 Cal.4th at pp. 1032–1033.)

---

[5] Numerous courts have reached this same conclusion. (*People v. Rios* (2009) 179 Cal.App.4th 491, 505 [101 Cal.Rptr.3d 713]; see also cases cited in *United States v. Carter* (2d Cir. 2007) 489 F.3d 528, 535; *United States v. Williams* (9th Cir. 2006) 435 F.3d 1148, 1157–1158 (*Williams*).) The only exception brought to our attention is *United States v. Carrizales-Toledo* (10th Cir. 2006) 454 F.3d 1142, where the appellate court pointed out that both the *Seibert* plurality and the four dissenting justices expressly rejected Justice Kennedy's focus on "the intent of the interrogating officer." (*Id.* at pp. 1150–1151.)

The *Seibert* plurality focused on objective factors "[b]ecause the intent of the officer will rarely be as candidly admitted as it was" there. (*Seibert, supra,* 542 U.S. at p. 616, fn. 6.) The plurality suggested the following objective facts as potentially relevant to "whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object: the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." (*Id.* at p. 615.)

Nonetheless, although the *Seibert* plurality took an objective approach, its "effectiveness" test is broad enough to encompass Justice Kennedy's conclusion that, when a deliberate two-step strategy has been used (i.e., a tactic designed to undercut the *effectiveness* of *Miranda* warnings), a defendant's postwarning statements must be excluded absent curative measures. (*Seibert, supra,* 542 U.S. at p. 622.)

" 'Although we independently determine whether, from the undisputed facts and those properly found by the trial court, the challenged statements were illegally obtained [citation], we " 'give great weight to the considered conclusions' of a lower court that has previously reviewed the same evidence." ' " (*People v. Whitson* (1998) 17 Cal.4th 229, 248 [70 Cal.Rptr.2d 321, 949 P.2d 18].)

We have not found, nor have the parties cited, any California case discussing the proper standard of review for a trial court's determination that law enforcement's two-step interrogation was, or was not, deliberate. But in *United States v. Narvaez-Gomez* (9th Cir. 2007) 489 F.3d 970, the Ninth Circuit stated: "Which appellate standard we use to review a district court's deliberateness finding is a matter of first impression. We determine that a deliberateness finding is appropriately reviewed as a factual finding for clear error. [Citation.] Employing the clear error standard is consistent with our review of similar district court determinations as to credibility and deliberateness." (*Id.* at p. 974.)

Recently, in *Carter v. State* (Tex.Crim.App. 2010) 309 S.W.3d 31, the court stated: "As an initial matter, we note that Justice Kennedy provided no guidance on how to conduct or review a deliberateness determination. We thus consider how various courts have treated such issues. In *United States v. Stewart* [(7th Cir. 2008) 536 F.3d 714, 719], the Seventh Circuit noted that '[t]here is not yet a general consensus among the circuits about the standard of review that applies to *Seibert*-deliberateness determinations, but the trend appears to be in the direction of review for clear error.' It explained that the 'question of whether the interrogating officer deliberately withheld *Miranda* warnings will invariably turn on the credibility of the officer's testimony in light of the totality of the circumstances surrounding the interrogation. This is a factual finding entitled to deference on appeal' and reviewed only for clear error. Numerous other jurisdictions have applied this same standard to the 'deliberateness' question in addressing 'question first, warn later' scenarios." (*Id.* at pp. 38–39, fns. omitted.) *Carter* cited several other cases which treated the lower court's determination of deliberateness as a factual finding entitled to deference, as well as *Anderson v. Bessemer City* (1985) 470 U.S. 564 [84 L.Ed.2d 518, 105 S.Ct. 1504], where the Supreme Court held the trial court's "finding of intentional discrimination is a finding of fact" (*id.* at p. 573), and that such a finding of intent " 'shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge . . . the credibility of the witnesses' " (*ibid.*).

Given Justice Kennedy's focus in *Seibert* on the subjective intent of the interrogating officer(s), we agree the trial court's determination of deliberateness is a factual finding entitled to deference.[6] As discussed above, California reviewing courts are bound by the trial court's factual findings if supported by substantial evidence (as compared to the clear error standard applicable in federal courts), and we must accord " ' " 'great weight' " ' " to the trial court's conclusions. (*People v. Whitson, supra,* 17 Cal.4th at p. 248.)

With these precepts in mind, we consider whether substantial evidence supports the court's finding Rondou did not deliberately employ a "question first-advise later" tactic. We first summarize both interviews and the Evidence Code section 402 hearing before determining whether the court properly admitted the challenged statements into evidence.

### 2. First Interview

At the start of the interview, Rondou asked defendant whether his tattoos were "prison tats" and whether he was on probation or parole. Defendant replied he was on probation. Rondou asked for what offense and how many times defendant had "been busted." Rondou then asked, "How about gang stuff?" and "What'd Hard Times call you?"

Rondou asked defendant if he knew the victim. Defendant replied he had never seen or met the victim before, that he and Martinez had simply "passed by . . . and seen somebody on the ground." Three times Rondou asked defendant whether he was *sure* the victim had not been with him earlier. Each time defendant reiterated he had *not* been with the victim. Rondou stated, "That's weird." "Because your cousin said [the victim] was with [you] guys all night." "Evidently you're not ready to tell the truth on what happened tonight, huh?" Rondou said the victim had been "hurt real bad" and was not "gonna make it," and that the victim's mother was suffering. Rondou added, "We talked to enough people; we pretty much know what happened." After telling defendant that "we didn't start off on a great foot, did we?" Rondou then said, "[W]hy don't we back up?" and asked defendant what happened that night.

Defendant then gave a complete account of his actions before and after the shooting. The officers asked defendant why Palacios had carried a gun, and whether defendant or Martinez had touched the gun. Rondou asked defendant to draw a map of the 7-Eleven store and its surroundings, and to designate where everyone was located. Defendant said he knew one of the BST

---

[6] Justice Kennedy's subjective test heightens "the role of trial courts . . . to ensure that the accused's *Miranda* rights are protected." (*State v. Gaw* (Mo. 2009) 285 S.W.3d 318, 324.)

members—a "tall guy, chunky"—because they "got in a fight" in the laundromat about "two months back." Defendant believed the BST members at the 7-Eleven store had "shot back" in response to Palacios' two gunshots. The persons who had shot back in the alley were "different" from the ones who had walked by the 7-Eleven store, because defendant "didn't see the big guy . . . ." In response to Rondou's questions, defendant stated Martinez was *not* the one who wanted to go back in the alley and shoot, and that Martinez did *not* tell Palacios to shoot.

The interview ended with Rondou asking if defendant needed "to use the restroom or anything," and defendant replying he needed a drink of water. At Rondou's request, defendant initialed and dated the map he had drawn.

### 3. *Second Interview*

Rondou began the interview by asking defendant if he would mind looking at some photographs that were being prepared, to see if he recognized "any of those guys." Rondou explained that "because of . . . the incident that happened . . . tonight, . . . [Rodriguez is] gonna read you these, you've got your rights read you before, right?" Defendant said, "Yeah." Rondou stated, "We got a kid who got hurt pretty bad out there," and "because of that, we've got to read you these. We'll go over it again, everything that happened and then hopefully by then the pictures are ready, we'll show them to you and . . . hopefully be done with it." Rodriguez then read defendant his *Miranda* rights. Rondou reiterated, "Like I said, I just want to go over again with you, is that okay?" and used defendant's drawing as he asked questions. Rondou said, "Just go over this with me one more time."

The rest of the interview repeated the same information already elicited in the first interview with a few extra details. For example, defendant explained that during the previous fight at the laundromat, he, Martinez, and Martinez's friend were beating up the big, chunky BST member, but then "other people jumped in" and, because defendant's group was drunk, they ended up losing and getting beaten up. Martinez knew that the big, chunky male and his brother lived in the third or fourth house down the alley. When the Camaro entered the alley, another car was there with its headlights off, but its parking lights on. Two or three people were creeping in the alley, saying "Fuck Lil Hood," and pretending with their fingers to have guns. After the gunfire started, defendant yelled to Palacios to "get in" as Martinez reversed the car.

At one point, defendant stated that when they first saw the BST members (presumably at the 7-Eleven store), he did not think Palacios was going to "pull out a gun and blast 'em." Instead, he thought they were just walking toward the BST members "to throw down . . . ." Rondou interjected, "[I]f two

gangs come together . . . to fight" and "you're walking over there saying let's fight and one of your homeboys has a gun, . . . would you expect that gun to get used?" Defendant said, "Oh, yeah," but explained he would not expect the gun to be used "right away . . . ." Instead, he would expect it to be used only after they had started fighting.

### 4. *Evidence Code Section 402 Hearing*

In January 2009, defendant filed a motion in limine pursuant to Evidence Code section 402 to suppress his statements made in the second interview. The sole witness at the Evidence Code section 402 hearing was Rondou. He testified the Santa Ana Police Department does *not* have a policy "to interview first, get a statement, and then *Mirandize* later." He testified he did *not* intentionally withhold a *Miranda* advisement in the first interview to obtain inculpatory statements which could be repeated by defendant in a second, *Mirandized* interview. According to Rondou, the tone of the interviews was *not* confrontational and no threats were made to defendant. In response to the court's questions, Rondou testified that no "promises of leniency or any other encouragements" were made to persuade defendant to talk, nor were any "words or actions [used] to pressure him to talk." The second interview took place in a different room of the police station no more than 30 minutes after the first one ended. Rondou and Rodriguez did *not* inform defendant that the statements he had already made in the first interview were inadmissible and could not be used against him.

Rondou recounted his actions on September 30, 2007. Around 3:00 a.m., he received a phone call at home. He went to the police station and then to the scene of the homicide. Rondou learned that (1) a white Camaro was stopped leaving the area where Palacios's body was found, and (2) there were two persons in the car who had been brought to the police station. The car's two occupants appeared to have been "with the victim at the time of the murder" and "to be friends" or "associated" with him. Rondou figured it "was a gang-related homicide . . . ." He "knew from prior contact that [defendant] had prior gang involvement." He knew the Camaro had been impounded and had a "possible bullet hole [in] the lower driver's side door."

Rondou interviewed Martinez at 8:40 a.m. From Martinez's initial interview, Rondou learned only that Martinez was with Palacios "at one time during the evening."

Rondou then interviewed defendant. He did not read defendant his *Miranda* rights at the first interview, even though Rondou assumed defendant "was brought to the police department in a custody-type setting . . . ." At the start of the first interview, Rondou did not know whether defendant was a

witness, victim, or suspect in the case. At some point during the interview, he or Rodriguez accused defendant of lying. During the interview, Rondou learned "about the first shooting," which took place at the 7-Eleven store. Rondou realized defendant might have some criminal culpability for the homicide. He and Rodriguez "stopped the interview," then *Mirandized* defendant before interviewing him again. They "talked about what was discussed in the first interview. Had him tell us again what took place that evening."

After Rondou finished testifying, defense counsel moved to have the transcripts of defendant's first and second interviews admitted into evidence to "give another dimension to . . . the officer's testimony." The People conceded defendant's first interview was custodial and inadmissible. Defense counsel and the prosecutor ultimately agreed to the court's reading the transcript of defendant's first interview and the first page of the second interview.

The court—having read the transcript of defendant's first interview and the first page of the second interview, as well as *Seibert, Williams, United States v. Carter*, other cases, and the parties' briefs—ruled defendant's first interview should be suppressed, but the second interview was admissible. The court stated *Seibert* involved "a pre-planned technique which had been taught to the officers," the "question first technique" which was "an end run around *Miranda*." The court relied on *Williams*'s analysis that Justice Kennedy's concurring opinion in *Seibert* constitutes the holding of the case. Finding *Williams* and *Carter* to be "very persuasive" and concluding they held "that *Seibert* lays out an exception to *Elstad* for cases in which a deliberate two-step strategy was used by law enforcement to obtain the post-warning confession," the court stated it did *not* "find that any kind of deliberate two-step process was used. Rondou behaved in a professional way. There were no threats or promises. There was no pressure that I saw in any of the statements in the transcripts." The court found it was *not* "crystal clear to the police officers at the scene that . . . defendant was a principal," but rather the situation was "murky" prior to the first interview. The court concluded, "*Seibert* is not applicable because there is no deliberately employed two-step process," and added that under *Elstad*, "if the first statement is voluntary, the second statement, provided it is voluntary and it complies with *Miranda*, is admissible."

5. *Substantial Evidence Supports the Court's Factual Finding the Police Did Not Use a Deliberate Two-step Strategy to Violate* Miranda

■ Substantial evidence supports the court's finding the officers did not deliberately use a two-step technique. Rondou testified he did *not* intentionally withhold *Miranda* warnings to obtain inculpatory statements in a second, *Mirandized* interview. He testified he made no threats or promises. The trial court found Rondou to be professional and, impliedly, credible. At the start of the first interview, the officers did not know under what circumstances defendant had been with Palacios at the time of his murder (or even, definitively, whether defendant had been with Palacios at all). Nor did they know about Palacios's gunshots at the 7-Eleven store or the prior fight a few months earlier at the Laundromat. Rondou testified it was not the police department's policy to *Mirandize* every potential witness or victim in a gang homicide case prior to interviewing them.

Nonetheless, this is a close case because of the continuity between the two interviews and because of the comprehensiveness of the first interview, which left "little, if anything, of incriminating potential left unsaid" (*Seibert, supra*, 542 U.S. at p. 616 (plur. opn.)), and which defendant describes as having "all the earmarkings of a classic custodial interrogation." Once the officers learned enough information to realize defendant was a suspect, they should have immediately terminated the interview. In the 34-page transcript of the first interview, defendant first disclosed Palacios's gunshots at the 7-Eleven store and the Camaro's entry into the alley on page 11, and the prior fight at the laundromat on page 20. Giving the officers the benefit of the doubt, however, defendant was not a classic suspect; he was ultimately tried on a provocative acts theory of murder. In the latter two-thirds of the interview, Rondou often appeared to seek identifying and/or incriminating information about the BST shooters and Martinez, not necessarily about defendant. The trial court read the transcript of the first interview, as well as the relevant case law, and found, in part based on its observation of Rondou's demeanor at the hearing, that the officers did not deliberately circumvent *Miranda*—a factual finding supported by substantial evidence.

### Defense Counsel Did Not Render Ineffective Assistance

Defendant contends his trial counsel "had no tactical reason for not urging the trial court" to review the transcript of defendant's second interview and to follow *Williams*'s formula for determining the deliberateness of the officers' actions. He also argues his counsel was deficient in failing to ensure the transcript of the second interview would be available for appellate review. Defendant raises the same claim in his habeas corpus petition in anticipation of the People's "waiver/default claim . . . ."

■ To prove an ineffective assistance claim, a defendant must show that (1) "counsel's performance was deficient," and (2) "the deficient performance prejudiced the defense." (*Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 104 S.Ct. 2052] (*Strickland*).) A court need not "address both components of the inquiry if the defendant makes an insufficient showing on one." (*Id.* at p. 697.) "Defendant bears the burden of proving ineffective assistance of counsel." (*People v. Haskett* (1990) 52 Cal.3d 210, 248 [276 Cal.Rptr. 80, 801 P.2d 323].)

When evaluating the adequacy of counsel's performance, a court asks whether counsel's assistance was reasonable "under prevailing professional norms" and in light of all circumstances existing at "the time of counsel's conduct." (*Strickland, supra,* 466 U.S. at pp. 688–690.) Because defense counsel face a "variety of circumstances" and an array of "legitimate decisions" (*id.* at p. 689), a court must "accord great deference to counsel's tactical decisions" (*People v. Lewis* (2001) 25 Cal.4th 610, 674 [106 Cal.Rptr.2d 629, 22 P.3d 392]) and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . ." (*Strickland, supra,* 466 U.S. at p. 689). Furthermore, "[i]f the record contains no explanation for the challenged behavior, an appellate court will reject the claim of ineffective assistance 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.' " (*People v. Kipp* (1998) 18 Cal.4th 349, 366–367 [75 Cal.Rptr.2d 716, 956 P.2d 1169].)

During the Evidence Code section 402 hearing in this case, defense counsel showed the court the transcripts of defendant's two interviews and moved for their admission into evidence. The court stated, "We have jurors coming in 10 minutes. It looks pretty thick." Due to the impending jury selection, the court suggested a "more expeditious" approach might be to recall Rondou and question him about specific passages in the transcripts. Defense counsel replied he wished "to read through a little bit before" deciding whether to recall Rondou and stated he did not "want to delay the court . . . ." The prosecutor stated he would agree to submitting on the transcript of the first interview, which was "only 34 pages." Defense counsel agreed to that proposal. Ultimately, the court read (and admitted into evidence) the transcript of the first interview and the first page of the second interview.

During argument, defense counsel drew the court's attention to the first page of the second interview where Rondou says, "I want to go over this with you again," arguing there was a "continuum" between the two interviews. Defense counsel argued that under *Seibert,* "it's an objective standard"

whether "the detectives deliberately employed the question-first technique"; therefore, Rondou or his partner might have acted deliberately without being "devious."

Defense counsel's performance was not deficient. In deciding whether to press the court to read the transcripts of both interviews, defense counsel was faced with the time constraints of the impending jury selection and the court's resulting suggestion to recall Rondou rather than to admit into evidence both transcripts. Defense counsel reviewed the transcripts, then agreed to admission of the first interview only. The record contains no explanation for his decision. But, the end result is that the court did read the entire first interview as well as the lead-in to the second interview. As discussed above, the first interview was of key import on the deliberateness issue, since defendant made a full disclosure of events. The court—having read the transcripts of the first interview *and* the first page of the second interview, and having heard Rondou's testimony—was apprised of the great majority of the objective facts deemed relevant by the *Seibert* plurality, i.e., "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." (*Seibert, supra,* 542 U.S. at p. 615.) Granted, the transcript of the second interview would have more clearly demonstrated the overlapping content of the two interviews. Still, it is apparent from the completeness of the first interview that it left few inculpatory revelations for defendant to disclose in the second. Furthermore, Rondou clarified at the start of the second interview that he intended to go over with defendant what had already been discussed.

The same holds true for the absence of the second transcript in the appellate record. Although we have reviewed a copy of that transcript in defendant's habeas corpus appendix, that document was not necessary to our conclusion that the first interview was comprehensive and detailed.

As to defendant's contention his counsel's performance was deficient because counsel failed to direct the court's attention to the *Williams* test for determining the deliberateness of the two-step tactic, defense counsel did argue that *Seibert* establishes an objective standard. This assertion was not wrong. Although Justice Kennedy focused on law enforcement's subjective intent, he shed no light on how a court should determine such intent. Defense counsel urged the court to view the objective indicia that the technique here was deliberately employed. Defense counsel was present during Rondou's testimony (including the officer's statement he did not intend to circumvent *Miranda*) and likely had some idea whether Rondou appeared to the court to

be credible. Possibly for that reason, he urged the court to apply an objective standard rather than focus on whether Rondou was devious or had an evil intent. Moreover, defense counsel's argument did not significantly differ from the *Williams* test, which simply instructs trial courts to consider "objective evidence and any available subjective evidence, such as an officer's testimony . . . ." (*Williams, supra,* 435 F.3d at p. 1158.) After the completion of counsel's argument, the court, in explaining its ruling, indicated it found *Williams* to be very persuasive. In that respect, defense counsel's failure to urge the court to apply the *Williams* test was not prejudicial since the court itself had read the case. There was no ineffective assistance of counsel here.

*Jury Instruction on Firearm Enhancement*

■ Defendant challenges the section 12022.53, subdivision (e)(1) gun enhancement attached to his murder conviction, arguing that "the court's instruction to the jury was inherently misleading and incorrect as a matter of law." Section 12022.53 establishes mandatory sentence enhancements for persons convicted of certain felonies (including murder) who used a firearm in committing the crime. (§ 12022.53, subds. (a)(1), (b)–(e).) Subdivision (c) of section 12022.53 mandates a consecutive 20-year enhancement for "any person who, in the commission of a felony specified in subdivision (a) [such as murder], personally and intentionally discharges a firearm . . . ." Subdivision (e)(1) of section 12022.53 imposes vicarious liability on an aider and abettor who does not personally use a gun, but who committed the crime "in participation of a criminal street gang." (*People v. Garcia* (2002) 28 Cal.4th 1166, 1171 [124 Cal.Rptr.2d 464, 52 P.3d 648].)

Here, the jury found true the People's allegations under section 12022.53, subdivisions (c) and (e)(1), that (1) defendant committed the murder of Palacios for the benefit of the Hard Times gang within the meaning of section 186.22, subdivision (b)(1), and (2) vicariously discharged a firearm during the commission of that murder within the meaning of section 12022.53, subdivisions (c) and (e)(1). Consequently, the court sentenced defendant to an additional and consecutive 20-year prison term for the firearm enhancement.

The court instructed the jury with CALCRIM No. 1402, as follows: "If you find the defendant guilty of the crimes charged in Counts 1 and 2 and you find that the defendant committed those crimes for the benefit of, at the direction of, or in association with a criminal street gang with the intent to promote, further, or assist in any criminal conduct by gang members, you must then decide whether, for each crime, the People have proved the additional allegation that one of the principals personally and intentionally discharged a firearm during that crime. You must decide whether the People have proved this allegation for each crime and return a separate finding for

each crime. [¶] To prove this allegation, the People must prove that: [¶] 1. Someone who was a principal in the crime personally discharged a firearm during the commission or attempted commission of the crime of murder. [¶] 2. That person intended to discharge the firearm[.] [¶] A person is a principal in a crime if he directly commits or attempts to commit the crime or if he aids and abets someone else who commits or attempts to commit the crime. [¶] . . . [¶] A person is an accomplice if he is subject to prosecution for the identical crime charged against the defendant. A person is subject to prosecution if he committed the crime or if: [¶] 1. He knew of the criminal purpose of the person who committed the crime; AND 2. He intended to, and did in fact, aid, facilitate, promote, encourage, or instigate the commission of the crime or participate in a criminal conspiracy to commit the crime. [¶] The People have the burden of proving each allegation beyond a reasonable doubt. If the People have not met this burden, you must find that the allegation has not been proved."

In reviewing defendant's assertion of instructional error, we bear in mind the following legal principles. "The trial court has a sua sponte duty to give correct instructions on the basic principles of the law applicable to the case that are necessary to the jury's understanding of the case," including the elements of a charged enhancement. (*People v. Williams* (2009) 170 Cal.App.4th 587, 638–639 [88 Cal.Rptr.3d 401].) " 'An appellate court reviews the wording of a jury instruction de novo' [citation], and determines whether 'the instructions are complete and correctly state the law' [citation]." (*People v. Bell* (2009) 179 Cal.App.4th 428, 435 [102 Cal.Rptr.3d 300].)

Defendant argues CALCRIM No. 1402, as read to the jury here, was misleading and incorrect because Palacios was the only shooter in defendant's group and Palacios cannot "be a principal or an accomplice to his own murder . . . ." The People agree that references in CALCRIM No. 1402 to "the crime" or "that crime" with respect to count 1 refer to the murder of Palacios. They argue, however, that although "Palacios, the only armed 'accomplice' of [defendant], could not technically be a 'principal' in count 1 as he could not aid and abet his own murder under the common law, the legislative intent behind" the gun enhancement supports a finding that defendant is subject to the enhancement "based on the particular circumstances surrounding this murder."

█ But legislative intent is best expressed by a statute's words. Here, the statutory language has a plain and unambiguous meaning. (*People v. Garcia, supra*, 28 Cal.4th at p. 1172.) Section 12022.53, subdivision (e)(1) states: "The enhancements provided in this section shall apply to any person who is a principal in the commission of an offense if both of the following are pled and proved: [¶] (A) The person violated subdivision (b) of Section 186.22

[commission of felony for criminal street gang]. [¶] (B) *Any principal in the offense* committed any act specified in" subdivision (c) (personal discharge of firearm). (Italics added.) Defendant, as a principal in Palacios's murder (by virtue of the provocative acts doctrine), satisfies the clause (A) prerequisite because he committed the offense for the Hard Times gang. But under clause (B), he is vicariously liable only for the personal discharge of a gun by another *principal* in the murder of Palacios charged in count 1.

■ Did a principal in Palacios's murder discharge a gun? The only shooter in defendant's group was Palacios. But Palacios "could not be found guilty of murder in connection with his own death . . . ." (*People v. Antick* (1975) 15 Cal.3d 79, 91 [123 Cal.Rptr. 475, 539 P.2d 43], disapproved on another ground in *People v. McCoy* (2001) 25 Cal.4th 1111, 1119–1120, 1123 [108 Cal.Rptr.2d 188, 24 P.3d 1210]; see also *People v. Superior Court (Shamis)* (1997) 58 Cal.App.4th 833, 845 [68 Cal.Rptr.2d 388].) Therefore, Palacios was not a principal in the offense. (§ 31.) An unknown person fired the shot that killed Palacios. And that unknown assailant was not a "principal in the offense" charged against defendant in count 1. (§ 12022.53, subd. (e)(1)(B).)

As there exists no shooter in defendant's group who is (or was) a principal in the offense charged in count 1, the jury's finding that defendant vicariously shot a gun during the commission of Palacios's murder is unsupported by substantial evidence. Defendant asserts instructional error. It is clear the jury was mislead by CALCRIM No. 1402, given the lack of evidentiary support for the enhancement. Possibly the jury was confused by the instruction's simultaneous coverage of the gun enhancements for both counts 1 and 2, and by the prosecutor's statement in his closing argument that Palacios was "one of the principals in the crime . . . ." The error was prejudicial as it is reasonably probable the jury would have reached a result more favorable to defendant absent the misleading instruction. (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 320–321 [109 Cal.Rptr.2d 851, 27 P.3d 739] [failure to instruct on element of enhancement is subject to *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243], harmless error standard, if associated crime is punishable by indeterminate term of life imprisonment].)

■ Because we reverse the gun enhancement to count 1, we consider the People's request that we "impose in its place the 10-year gang enhancement under section 186.22, subdivision (b), which was found true by the jury but struck by the trial court at sentencing . . . due to the imposition of the greater 20-year firearm enhancement." But "[s]ection 186.22[, subdivision] (b)(1)(C) does not apply . . . where the violent felony is 'punishable by imprisonment in the state prison for life.' [Citation.] Instead, section 186.22, subdivision (b)(5) . . . applies and imposes a minimum term of 15 years before the

defendant may be considered for parole." (*People v. Lopez* (2005) 34 Cal.4th 1002, 1004 [22 Cal.Rptr.3d 869, 103 P.3d 270].) This is true even though "a minimum parole eligibility term of 15 years, will have no practical effect for first degree murderers, who now have a minimum parole eligibility term of 25 years [citation], or for second degree murderers, who now have a minimum parole eligibility term of 15 years [citation]." (*Id.* at pp. 1008–1009.)

## DISPOSITION

The conviction is affirmed but the sentence must be modified by striking the 20-year firearm enhancement to count 1 imposed under section 12022.53, subdivision (e)(1). The cause is remanded to the trial court for resentencing consistent with this opinion. The petition for writ of habeas corpus is denied.

Bedsworth, Acting P. J., and Fybel, J., concurred.

Appellant's petition for review by the Supreme Court was denied January 19, 2011, S187857.