Duarte, J.
A jury found defendant Ezekiel Isaiah Delgado guilty of two counts of first degree murder and one count of discharging a firearm at an occupied vehicle, found true a multiple-murder special circumstance and found that Delgado personally used a firearm, causing death. ( Pen. Code, §§ 187, subd. (a), 190.2, subd. (a)(3), 246, 12022.53, subd. (a).) The trial court sentenced him to prison for a total unstayed term of 100 years to life. He timely filed this appeal.
On appeal, defendant first claimed (1) his inculpatory statements to the police should have been excluded on various grounds, (2) no substantial evidence supported the murder charge, (3) the trial court misinstructed on felony murder, (4) the trial court misinstructed on voluntary intoxication, (5) limits on the voluntary intoxication defense violate due process, and (6) he was entitled to a juvenile transfer hearing because of the passage of Proposition 57. The Attorney General concedes the last point. We asked for supplemental briefing on several additional issues.
We agree with the parties that we must remand for a juvenile transfer hearing and agree with defendant that--while on remand--the trial court should have the opportunity to consider exercising its newly acquired discretion regarding firearm enhancements, as we describe post . In the published portion of this opinion, part I, we conclude the trial court erred in admitting some of defendant's inculpatory admissions, but find the error harmless beyond a reasonable doubt. We disagree with defendant's remaining contentions of error, as we explain in the unpublished portions of our opinion.
BACKGROUND
Near midnight on April 9-10, 2014, defendant, then aged 16, went with Taylor Cober and Elose Brown, purportedly to buy a small amount of marijuana. The seller (DeShawne Cannon) and his female companion (Gina Elarms) were sitting in a sedan. Brown had $40 and defendant gave Brown his wallet with $25 in it; the total was less than the agreed-upon amount of $70. Defendant told a detective he thought Cannon was reaching for a gun, so he shot him. He then shot Elarms because she could identify him, then shot Cannon again. He emptied his 10-shot pistol from behind, striking Cannon five times and Elarms at least three times. His admissions and reenactment were video recorded and shown to the jury. Defendant and Brown each claimed to have taken Elarms's purse, splitting the money contained therein.
Brown and Cober were given immunity and testified they thought the plan was to buy marijuana. Brown heard the shooting but claimed not to have seen it. Later, *702 defendant told Brown he thought Cannon was preparing to shoot and defendant shot him to protect Brown. Cober testified defendant admitted shooting someone. In confusing passages, Cober testified there may have been mention of doing a "lick" (robbery) earlier, but he had thought it was said in jest.
There was corroborative but inconclusive testimony from two witnesses about the perceived ethnicity and clothing of people they saw leaving after the shootings. A review of defendant's telephone revealed searches for stories about the incident and inquiries about Amtrak and Greyhound schedules.
The defense theory was that defendant falsely confessed to protect his friends and earn street credibility. No robbery had been planned. At worst defendant acted rashly, not with deliberation, after he thought Cannon was going to pull a weapon. This would be voluntary manslaughter, via an imperfect self-defense theory.
The prosecutor argued for premeditated murder because defendant had time to reflect, fired at least five times at Cannon, shot Elarms at least three times, then shot Cannon again. Felony murder also could apply because from the evidence it was rational to infer a plan to rob the seller.
The jury convicted defendant as charged.
DISCUSSION
I
Admission of Inculpatory Statements
In overlapping claims, defendant contends he was unlawfully arrested, he was questioned in violation of Miranda , and his post- Miranda statements were tainted by the procedures used by the detectives. (See Miranda v. Arizona (1969) 396 U.S. 868, 90 S.Ct. 140, 24 L.Ed.2d 122.) We find error in part, but no prejudice.
A. Overview
Although we do not agree entirely with defendant, we agree that many mistakes were made. As we will describe, the communication among the involved detectives was inadequate to say the least.
Two seasoned detectives in the first team arrested defendant under the mistaken belief there was an outstanding warrant for his arrest. They took him in handcuffs to the station, seized his belongings including his cell phone, and left him shackled in an interrogation room for nearly an hour and a half. They did not tell the second team they had arrested and shackled him. They did not Mirandize him.
When the first detective in the second team found defendant, he immediately unshackled him, told him he was not under arrest and was free to leave, and a ride would be arranged for him. Defendant answered some questions, but made no inculpatory statements. After defendant was left in that room again, a second detective from the second team came in and immediately demanded that defendant unlock his cell phone so its contents could be retrieved. Although this detective also initially told defendant he was not under arrest, when defendant asked how long he would be there, the detective indicated the answer hinged on completion of the data retrieval process. He then questioned defendant at length. When defendant eventually admitted that he had shot the victims, a third detective in the second team--who had been watching through a one-way mirror--told the second detective via text message that it was time to Mirandize defendant. That was done, defendant was invited to repeat what he said, and he repeated and elaborated on his *703 admissions, spontaneously moving chairs to reenact the crimes.
In a detailed written ruling, the trial court found defendant was in custody at the beginning, was freed from custody by the first interrogator, but was not back into custody until he admitted to the second that he had shot the victims. The court found defendant's statements, including those after the Miranda warnings, were voluntary, and not the product of a deliberate plan to evade Miranda .
We disagree with the trial court's determination of when custody was reinstated. When the second interrogator demanded access to defendant's cell phone and indicated he could not leave until it was examined, defendant was back in custody, and therefore his unwarned statements should have been excluded. No reasonable person would have felt free to leave at that time under these circumstances. However, precedent dictates that absent a deliberate policy or practice to evade Miranda , a subsequent voluntary warned confession is admissible notwithstanding a prior unwarned confession. (See Missouri v. Seibert (2004) 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 ; People v. Camino (2010) 188 Cal.App.4th 1359, 116 Cal.Rptr.3d 173 ( Camino ).) Although all of defendant's unwarned statements should have been suppressed as the products of a custodial interrogation without a Miranda waiver, the finding that the subsequent warned confession was voluntary is supported by the record.
The subsequent warned confession was cumulative of and more detailed than the unwarned confession. Therefore, we conclude beyond a reasonable doubt that the Miranda violation did not contribute to the verdicts and was not prejudicial to defendant. (See Chapman v. California (1967) 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705.)
Our conclusion should not be read to condone the multiple inexplicable failures to communicate and other mistakes demonstrated by this record.
B. Facts at Suppression Hearing
Detective Brian Meux (who had about 20 years as a peace officer) testified Cannon's cell phone was found at the crime scene and pointed the investigation to Brown, who had texted Cannon (using the moniker "WK Lynch") about a marijuana deal shortly before the killings. Meux helped execute a search warrant at Brown's residence beginning about 5:15 p.m. on April 11, 2014. Meux and fellow detectives, Angela Kirby and Jason Lonteen, had investigated Brown's associates via sheriff's records and social media, and linked Brown with a man named "Lynch" and defendant. When the warrant was executed, defendant, Cober, Brown, and some of Brown's relatives were present, and the team wanted to talk to all of them.
Although Meux apparently did not know this, Detectives French and Roberts had brought defendant to the station in handcuffs, taken his belongings, and shackled him to the floor of an interrogation room. The video shows they left defendant at about 6:54 p.m. Meux did not come in the room until about 8:18 p.m., meaning defendant was left shackled to the floor and alone in the room for nearly an hour and a half.
Meux testified he first spoke to Brown and his mother, and then went to the room where defendant was held. Meux was surprised to find him in shackles and freed him to use the bathroom; according to Meux, defendant was not then a suspect in the murders. Because of the way he had found defendant, Meux assured him that he was not under arrest, was free to leave, and did not have to talk. The video recording *704 (with audio) shows that Meux offered to get defendant a ride or to have someone pick him up but did not wait for defendant's verbal response before beginning questioning. Meux understood that at Brown's house defendant had given officers a false name, and at some point Meux learned he was on probation. Defendant had said he had an outstanding arrest warrant, but eventually Detective Rose told Meux that he could find no such warrant.
Meux questioned defendant about his whereabouts at the time of the crimes, and although defendant denied involvement he gave answers that conflicted with information Cober had provided, leading Meux to conclude defendant was lying. Accordingly, Meux had pressed defendant to tell him the truth. When he left the room, Meux told defendant he was going to close the door so other people would not see defendant, but that the door was not locked and defendant was not under arrest. Meux left the station to try to find Lynch, who was still considered a prime suspect, but suggested that Detective Lonteen question defendant. Before Meux found Lynch, he heard from Detective Kirby that defendant had admitted the shooting; he told her he had not Mirandized defendant, he had merely given defendant the standard Beheler admonitions applicable to non-arrested persons. (See California v. Beheler (1983) 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275.)
On cross-examination Meux testified that although he asked defendant if he had been involved in the murder, and told defendant he did not believe him, he still thought defendant was a witness rather than a suspect. Meux also testified that before Lonteen questioned defendant, Detective Rose told Meux that defendant did not have a warrant, and Meux believed Lonteen was present and knew this.
Lonteen (who had 16 years as a peace officer) testified he had been interviewing Brown's mother and sister and did not watch Meux interview defendant. Meux had told Lonteen that Meux did not believe defendant was truthful about his whereabouts, and Meux's summary to Lonteen of defendant's statements did not match what Lonteen had heard from Brown's relatives. Lonteen did not know defendant had been arrested and recalled nothing about a warrant.
The video shows that Meux left the room at about 8:45 p.m., and about 15 minutes later someone showed defendant to the bathroom; defendant was returned to the room at about 9:06 p.m., and about 10 minutes later Lonteen entered the room. Lonteen found that the door was ajar and defendant was not restrained. Lonteen demanded that defendant provide the password to unlock his cell phone (which previously had been taken from him); defendant unlocked it and gave Lonteen the password, and Lonteen told defendant the cell phone's contents would be downloaded by the police.
The transcript shows (consistent with the video) that Lonteen entered the room and immediately after identifying himself said:
"[Lonteen:] [H]ere's the thing dude. We gotta verify some stuff. We need to get in your phone . What's the passcode?
"[Defendant:] For - what is this for?
"[Lonteen:] Just to go through - we've got to go through some of this stuff man to make sure you're telling us on the up and up. All right?
"[Defendant:] Yeah.
"[Lonteen:] So I'm trying to help you out by doing that. I just want to try to give you an opportunity so we can do that. So, um, you can punch it in or I can do it. It's up to you ." (Italics added.)
*705 Lonteen testified defendant asked him how long defendant would be there because Meux had told him he was free to go; Lonteen confirmed that defendant was free to go. But the transcript (and video) reflects that the following occurred:
"[Defendant:] And, ah, how long am I gonna be here?
"[Lonteen:] We're trying to figure that out right now ....
"[Defendant:] Because . . the other man [i.e., Meux] told me that I'm not under arrest or anything so.
"[Lonteen:] Okay, yeah. That's true."
"[Defendant:] I just - that - that's why I just want to know how long am I gonna be here.
"[Lonteen:] We're gonna try to make it not too much longer . I'm gonna dump this off. I'm gonna have it - I'll be right back to talk to you and just ask you a few more questions, okay?
"[Defendant:] All right.
"[Lonteen:] Um, in case this [cell phone] locks up again what is [the code]?
"[Defendant:] 7400." (Italics added.)
Thus, although Lonteen told defendant the police would try to expedite the download so that defendant could leave, he did not at that point tell defendant he could leave at any time of defendant's choosing. Leaving hinged on completion of the download.
After Lonteen dropped the cell phone off for review, he returned to question defendant, telling him his account of his whereabouts did not make sense. Eventually, after Lonteen repeatedly told defendant he did not believe him, at about 9:56 p.m. (i.e., after about 35 minutes of questioning) defendant admitted he had shot the victims. About six or seven minutes later, Kirby texted Lonteen to tell him to Mirandize defendant.
Kirby (who had 20 years as a peace officer) testified that at Brown's residence defendant had given a false name and she knew it was false and that he was on juvenile searchable probation and was an associate of Brown's. Detectives French and Roberts told her defendant had told them he thought he had an outstanding arrest warrant. After Meux's interview, someone told her the lack of a warrant had been confirmed. When she heard defendant make admissions to Lonteen, she texted Lonteen to tell him to Mirandize defendant.
After briefly leaving and returning to give defendant some water and chips, Lonteen returned to the room and read defendant his Miranda rights; defendant said he understood them. This was at about 10:18 p.m.
Before he was Mirandized , defendant had told Lonteen that he and Brown went to buy some marijuana and defendant shot Cannon when he reached for something shiny that defendant feared was a gun; he also shot Elarms. Neither Brown nor Cober knew defendant had a gun. Defendant said he took Elarms's purse after shooting her. The purse was thrown away near an apartment. His friends had nothing to do with any of this.
After the Miranda warnings, defendant explained what happened in more detail. In particular, and on his own initiative, defendant moved chairs around to show the position of the victims in the car and where he was when he shot each one. His performance showed he was standing outside the car on the passenger's side, behind the victims. He then demonstrated how he fired his gun at each of them in turn, replete with sound effects. The video shows defendant appeared eager to tell his story and freely did so.
*706 C. Argument and Ruling
Defense counsel argued correctly that juveniles do not get bail (see Tiffany A. v. Superior Court (2007) 150 Cal.App.4th 1344, 1361, 59 Cal.Rptr.3d 363 ), and reasoned therefrom that even if there had been an arrest warrant, defendant would have been in custody as a matter of law. If there had not been an arrest warrant, he should not have been arrested at all, meaning the products of his arrest (his admissions) should be excluded. Counsel argued that although there was no evidence of a plan to evade Miranda , Lonteen made a decision not to Mirandize defendant until Kirby told him to do so, and there was no substantial break in the questioning, therefore the warned admissions should be suppressed.
The prosecutor argued that defendant told the detectives he had an outstanding warrant, and confirmed this at the station before he was told to empty his pockets and shackled to the floor. Meux later unshackled defendant and told him he was free to go.
The trial court gave an initial oral ruling, followed by a more detailed written ruling at the end of trial. The following summary incorporates both rulings.
First, French and Roberts lawfully arrested defendant in the reasonable belief that there was an outstanding warrant for his arrest, based on what defendant himself told them. Defendant was in custody then.
Second, defendant was involuntarily transported to the station, where he was shackled to the floor and had all his property taken, showing he remained in custody. But because he had not said anything the People wanted to introduce, there was no evidence to exclude from that period.
Third, Meux expressed genuine surprise at discovering defendant was shackled, unshackled him, told him he was not under arrest and was free to leave, and offered him a ride. At that point defendant was freed from custody; this was not a planned ruse to trick him into talking, even given defendant's age.
Fourth, once defendant told Lonteen that he shot the victims, he was again in custody because no reasonable person (whether an adult or a 16-year-old) would think he or she could leave.
Fifth, the officers had no policy or plan to circumvent Miranda .
Sixth, defendant's statements were voluntary.
Accordingly, the motion to suppress was denied.
D. Analysis
1. Arrest and Detention
We first address defendant's claim that his arrest and detention were unlawful. Defendant's view is that such unlawfulness tainted the inculpatory statements later elicited. (See Wong Sun v. United States (1963) 371 U.S. 471, 485, 83 S.Ct. 407, 9 L.Ed.2d 441 ["verbal evidence which derives so immediately from ... an unauthorized arrest as the officers' action in the present case is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion"]; Brown v. Illinois (1975) 422 U.S. 590, 601-604, 95 S.Ct. 2254, 45 L.Ed.2d 416 [ Miranda warnings do not necessarily attenuate the taint of an unlawful arrest]; People v. Gonzalez (1998) 64 Cal.App.4th 432, 440-442, 75 Cal.Rptr.2d 272.)
We find the officers had probable cause to arrest defendant.
"Probable cause exists when the facts known to the arresting officer would persuade someone of 'reasonable caution' that the person to be arrested has *707 committed a crime. [Citation.] '[P]robable cause is a fluid concept-turning on the assessment of probabilities in particular factual contexts ....' [Citation.] It is incapable of precise definition. [Citation.] ' "The substance of all the definitions of probable cause is a reasonable ground for belief of guilt," ' and that belief must be 'particularized with respect to the person to be ... seized.' [Citation.]" ( People v. Celis (2004) 33 Cal.4th 667, 673 [16 Cal.Rptr.3d 85, 93 P.3d 1027].)
The record shows defendant was known to be on probation and told detectives both at the Brown residence and at the station that he thought there was an outstanding warrant for his arrest. As the Attorney General argues, it was rational for the officers to believe defendant, arrest him, and detain him until they learned otherwise. (See 2 LaFave, Search and Seizure (5th ed. 2017) Probable Cause, § 3.6(f), pp. 448-456 [first-hand information can supply probable cause].)
Defendant secondarily claims it took the officers too long to discover that he was wrong about having an outstanding warrant, thus his detention was unlawfully prolonged. The record does not explain exactly when the detectives learned there was no arrest warrant, but it was before Lonteen entered the room. And although defendant refers to "hours" in custody, Meux effectively freed defendant (by telling him he could go and offering him a ride) after 84 minutes. This timeframe was consistent with Meux's testimony that before Lonteen questioned defendant, Meux had heard from Rose that there was no warrant. We cannot say 84 minutes was too long as a matter of law for the officers to ascertain that no warrant existed, given the circumstances. Until the absence of a warrant was determined, the detectives had no basis to release defendant, and nothing in the record shows that discovery of the lack of a warrant could have been made sooner. (Cf. People v. McGaughran (1979) 25 Cal.3d 577, 586, 159 Cal.Rptr. 191, 601 P.2d 207.)
In the context of a vehicle stop, we explained how to evaluate claims of prolonged detention:
"An investigatory stop exceeds constitutional bounds when extended beyond what is reasonably necessary under the circumstances that made its initiation permissible. [Citation.] Circumstances which develop during a detention may provide reasonable suspicion to prolong the detention. [Citation.] There is no set time limit for a permissible investigative stop; the question is whether the police diligently pursued a means of investigation reasonably designed to confirm or dispel their suspicions quickly . [Citations.]" ( People v. Russell (2000) 81 Cal.App.4th 96, 101-102 [96 Cal.Rptr.2d 568], italics added.)
That presents the partly factual question of how long it should have taken to confirm or dispel defendant's own belief that he was a wanted juvenile. The record does not show that 84 minutes was too long. (Cf. People v. Gabriel (1986) 188 Cal.App.3d 1261, 1265, 233 Cal.Rptr. 769 [rejecting claim that a detention while a search warrant was being executed was too long "simply because of its one-and-a-half to two-hour length" because "the record is devoid of any evidence that the officers engaged in any misconduct or in any way delayed the search"].)
Thus, we reject defendant's claim that the detention was unlawfully prolonged. For this reason, we need not address whether everything else that followed was the product of an unlawful arrest or unduly prolonged detention.
*708 2. Miranda violation
Defendant contends all his statements should have been suppressed for violation(s) of the Miranda rules, arguing that he was in custody from the beginning. We agree with defendant in part, as we now explain.
" 'In considering a claim that a statement or confession is inadmissible because it was obtained in violation of a defendant's rights under Miranda ..., the scope of our review is well established. "We must accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if they are substantially supported. [Citations.] However, we must independently determine from the undisputed facts, and those properly found by the trial court, whether the challenged statement was illegally obtained." ' [Citation.] ' "Although we independently determine whether, from the undisputed facts and those properly found by the trial court, the challenged statements were illegally obtained [citation], we ' "give great weight to the considered conclusions" of a lower court that has previously reviewed the same evidence.' " ' [Citation.]" ( Camino , supra , 188 Cal.App.4th at pp. 1370-1371 [116 Cal.Rptr.3d 173].)
Miranda applies only to custodial interrogations, and whether a person is in custody hinges on whether a reasonable person in her or his shoes would feel free to leave. (See Howes v. Fields (2012) 565 U.S. 499, 508-509, 132 S.Ct. 1181, 182 L.Ed.2d 17 ; People v. Aguilera (1996) 51 Cal.App.4th 1151, 1161-1162, 59 Cal.Rptr.2d 587.) We take the juvenile's age into consideration when determining whether a reasonable person would feel free to leave under the same circumstances. (See In re I.F. (2018) 20 Cal.App.5th 735, 760, 229 Cal.Rptr.3d 462.) Although Meux effectively freed defendant from custody, Lonteen renewed his custodial status, as we now explain.
We begin by pointing out the obvious: that cell phones are now ubiquitous and often contain highly private personal information. Although the trial court found that: "When Lonteen entered the interview room with defendant Delgado, he introduced himself and asked Delgado for the access code for his cell phone so he could do a 'dump' of its contents" (italics added), this finding is not fully supported by the record. Lonteen demanded access. When defendant asked when he could leave, Lonteen indicated it depended on when the data was obtained. In effect, defendant asked to leave and Lonteen denied his request.
At that point defendant, aged 16, had been arrested, taken in handcuffs to the station, shackled to the floor of an interrogation room, forced to give up his possessions, and left alone in that room for nearly an hour and a half. Although Meux thereafter effectively freed him, there were lingering indicia of custody that must be factored in to the reasonable-person calculus to answer the custody question as of the time Lonteen spoke to defendant. At that moment, defendant told Lonteen that Meux had told defendant he was free to leave. Lonteen then demanded access to defendant's cell phone, and when defendant asked when he could leave, indicated the data extraction would have to be done first . Given the entire course of events, no reasonable person, whether adult or juvenile, would have felt free to leave at that time. Accordingly, Lonteen should not have asked defendant any questions before Mirandizing him. Therefore, all of defendant's unwarned statements should have been suppressed, and the trial court's denial of the motion was error.
*709 3. Seibert and Voluntariness
The trial court found the warned admissions were not the product of a planned effort to undermine the Miranda rule, but flowed from missteps and miscommunications. The court's finding that there was no subjective plan to evade Miranda is reviewed for substantial evidence. (See Camino , supra , 188 Cal.App.4th at pp. 1364, 1372, 116 Cal.Rptr.3d 173 ; People v. Rios (2009) 179 Cal.App.4th 491, 507, 101 Cal.Rptr.3d 713 ( Rios ).) There were multiple opinions in Seibert , which addressed this issue. The tie-breaking vote was by Justice Kennedy. Accordingly, we look to his opinion to determine the ground on which a majority of the high court agreed. (See Camino , supra , 188 Cal.App.4th at p. 1370 & fn. 5, 116 Cal.Rptr.3d 173 ; Rios , supra , 179 Cal.App.4th at pp. 504-505, 101 Cal.Rptr.3d 713.)
As background, Oregon v. Elstad (1985) 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 had rejected a "cat out of the bag" approach dictating that once an unwarned statement is made a subsequent warned statement is inadmissible because a person cannot effectively take back what she or he has said. Instead, Elstad held in part: "[T]hough Miranda requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." ( Oregon v. Elstad , supra , 470 U.S. at p. 309, 105 S.Ct. 1285.)
In Seibert , Justice Kennedy stated his controlling views in part as follows:
" Elstad reflects a balanced and pragmatic approach to enforcement of the Miranda warning. An officer may not realize that a suspect is in custody and warnings are required ...." ( Missouri v. Seibert , supra , 542 U.S. at p. 620 [124 S.Ct. 2601], opn. of Kennedy, J., italics added.)
"This case presents different considerations. The police used a two-step questioning technique based on a deliberate violation of Miranda . The Miranda warning was withheld to obscure both the practical and legal significance of the admonition when finally given." ( Id . at p. 620 [124 S.Ct. 2601].)
"When an interrogator uses this deliberate, two-step strategy , predicated upon violating Miranda during an extended interview, postwarning statements that are related to the substance of prewarning statements must be excluded absent specific, curative steps." ( Id . at p. 621 [124 S.Ct. 2601], italics added.)
"I would apply a narrower test applicable only in the infrequent case, such as we have here, in which the two-step interrogation technique was used in a calculated way to undermine the Miranda warning. [¶] The admissibility of postwarning statements should continue to be governed by the principles of Elstad unless the deliberate two-step strategy was employed." ( Id . at p. 622 [124 S.Ct. 2601], italics added.)
In short, Seibert categorically barred admission of warned statements, whether voluntary or not, that are obtained by a deliberate attempt to thwart the Miranda safeguards. (See Camino , supra , 188 Cal.App.4th at pp. 1369-1370, 116 Cal.Rptr.3d 173 ; Rios , supra , 179 Cal.App.4th at pp. 504-505, 101 Cal.Rptr.3d 713.) The trial court made a factual finding that no proscribed two-step technique was employed in this case, and that finding is supported by the evidence recounted ante .
In various ways, defendant tries to fit this case within Seibert . In support, he relies on authority listing some objective indicia courts may consider in determining whether an intentional procedure was used *710 to circumvent Miranda . (See, e.g., United States v. Williams (9th Cir. 2006) 435 F.3d 1148, 1158-1159 ; Camino , supra , 188 Cal.App.4th at p. 1370, 116 Cal.Rptr.3d 173.) Although we ultimately determine the admissibility of evidence in the face of Miranda or voluntariness challenges, we are reviewing the trial court's factual finding regarding intent. " 'It is true that it is very difficult to prove what the state of a man's mind at a particular time is, but if it can be ascertained it is as much a fact as anything else.' " ( Postal Service Bd. of Governors. v. Aikens (1983) 460 U.S. 711, 716-717, 103 S.Ct. 1478, 75 L.Ed.2d 403 ; see United States v. Williams (2008) 553 U.S. 285, 306-307, 128 S.Ct. 1830, 170 L.Ed.2d 650 ; People v. Johnson (1901) 131 Cal. 511, 514, 63 P. 842.) We take Justice Kennedy's opinion as written: It requires a finding of a deliberate intent and plan to circumvent Miranda . We uphold the trial court's finding there was no such intention.
The record, far from suggesting any deliberate protocol to undermine Miranda guided the detectives, instead suggests they acted with little or no method at all. Further, we agree with the trial court that defendant's warned statements were voluntary.
"Where the voluntariness of a confession is raised on appeal, the reviewing court should examine the uncontradicted facts to determine independently whether the trial court's conclusion of voluntariness was proper. If conflicting testimony exists, the court must accept that version of events that is most favorable to the People to the extent it is supported by the record. [Citation.]" ( In re Shawn D. (1993) 20 Cal.App.4th 200, 207-208, 24 Cal.Rptr.2d 395.)
" '[T]he question in each case is whether the defendant's will was overborne at the time he confessed. ... The burden is on the prosecution to show by a preponderance of the evidence that the statement was voluntary. [Citation.] 'When, as here, the interview was tape-recorded, the facts surrounding the giving of the statement are undisputed, and the appellate court may independently review the trial court's determination of voluntariness.' [Citation.]" ( People v. Dowdell (2014) 227 Cal.App.4th 1388, 1401, 174 Cal.Rptr.3d 547.)
"A confession is involuntary under the federal and state guaranties of due process when it has been extracted by any sort of threats or violence, or obtained by any direct or implied promises, however slight, or by the exertion of any improper influence. [Citations.] Coercive police activity is a necessary predicate to a finding that a confession was involuntary under both the federal and state Constitutions. [Citations.]" ( In re Joseph H. (2015) 237 Cal.App.4th 517, 534, 188 Cal.Rptr.3d 171.)
We have watched the lengthy video and are convinced that no police coercion occurred and that defendant's will was not overborne. Defendant presents as a mature and savvy youth; he never appears cowed or browbeaten. The questioning was not abusive, and defendant had three restroom breaks, was given water twice, and was given a snack. During the post-warning period, entirely on his own initiative, he acted out the murders complete with sound effects. Nothing in the video indicates that defendant felt coerced in the constitutional sense of the term at any time while he was being questioned.
Defendant's briefing points out that after defendant admitted the killings but just before he was Mirandized he asked: "Do you think I can make a phone call?" Lonteen told him he could, and when defendant asked if that meant only one Lonteen told defendant he could make more than one, then Mirandized him. But defendant did not ask to make any calls at that *711 moment , and therefore this does not show his statements were involuntary. Put another way, this incident did not signal to defendant that he was being held incommunicado, as his briefing seems to imply. Nor do we find anything menacing in the fact that two different detectives questioned defendant over a few evening hours while expressing disbelief at his exculpatory story. The video refutes the claim of involuntariness.
Defendant suggests that he never voluntarily waived his Miranda rights. We disagree. After Lonteen Mirandized defendant and defendant separately said he understood each one of the four Miranda rights, the following occurred:
"[Lonteen:] Okay, I'm gonna kind of go back over a lot of these things that we talked about and make sure that again, I understand the right story. Are you okay with that?
"[Defendant:] You say what?
"[Lonteen:] Are you okay with doing that?
"[Defendant:] Going back?
"[Lonteen:] Just - just kind of going through again and making sure that I understand all the story.
"[Defendant:] Yeah, yeah, yeah."
Although the better practice is to obtain an explicit waiver of Miranda rights, an explicit waiver is not required. Lonteen ensured defendant understood his rights and wanted to talk; although not ideal, that was sufficient. "The core issue in ruling on a challenge to a Miranda waiver is whether an in custody accused made an uncoerced and fully aware choice not to assert the right to counsel or silence." ( Rios , supra , 179 Cal.App.4th at p. 499, 101 Cal.Rptr.3d 713 ; see People v. Whitson (1998) 17 Cal.4th 229, 245-250, 70 Cal.Rptr.2d 321, 949 P.2d 18.) Defendant was aware of his choices and chose to talk. Because defendant's warned statements were voluntary and there was no plan to bypass Miranda , the warned statements were admissible under Seibert and related cases.
4. Prejudice
Because the trial court allowed the jury to hear (and watch) the unwarned admissions, we must decide whether the error was harmless beyond a reasonable doubt.
"The beyond-a-reasonable-doubt standard of Chapman 'requir[es] the beneficiary of a [federal] constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' [Citation.] 'To say that an error did not contribute to the ensuing verdict is ... to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.' [Citation.] Thus, the focus is what the jury actually decided and whether the error might have tainted its decision. That is to say, the issue is 'whether the ... verdict actually rendered in this trial was surely unattributable to the error.' [Citation.]" ( People v. Neal (2003) 31 Cal.4th 63, 86 [1 Cal.Rptr.3d 650, 72 P.3d 280] ; see People v. Elizalde (2015) 61 Cal.4th 523, 542 [189 Cal.Rptr.3d 518, 351 P.3d 1010].)
Another way to phrase the Chapman test is this: " 'Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?' " ( People v. Merritt (2017) 2 Cal.5th 819, 827, 216 Cal.Rptr.3d 265, 392 P.3d 421.) Here, the answer is "yes."
Although we reject the Attorney General's initial view that the testimony of defendant's companions that night coupled with vague corroboration from eyewitnesses renders the error harmless, we *712 agree that defendant's warned statements fully encompassed his unwarned statements, were more detailed, and included his spontaneous and vivid reenactment of the crimes. Defendant does not point to anything significant in the unwarned statements that was not repeated during the warned statements. Although during argument the prosecutor mentioned the point at which defendant said he would tell the truth, the prosecutor repeatedly emphasized the physical reenactment and described how that fit with the forensic evidence, arguing this showed defendant was telling the truth. Thus, the inadmissible evidence was at worst partly cumulative of the admissible evidence. Although defendant contends the statements were "joined at the hip" and "interlocking," because all the statements (and actions) were video recorded, there was no uncertainty about what defendant said or did. The jury would either find defendant meant what he said or find he was trying to protect his companions and earn street credibility by assuming liability for the shootings. Contrary to defendant's view, that calculus would not have changed if the more limited unwarned statements had been suppressed, as they should have been. Therefore, we can be sure that the verdicts were not attributable to the Miranda error.
The fair administration of justice demands that peace officers be trained in Miranda procedures and adhere to their training. The system did not function in several ways in this case. But the mistakes made did not prejudice defendant.
II-VI**
DISPOSITION
The judgment of the criminal court is conditionally reversed. The cause is remanded to the juvenile court with directions to conduct a transfer hearing as discussed within this opinion, no later than 90 days from the filing of the remittitur.
If, at the transfer hearing, the juvenile court determines that it would not have transferred defendant to a court of criminal jurisdiction, the verdicts shall be treated as juvenile adjudications and a dispositional hearing shall be held in due course. If the juvenile court determines that it would have transferred defendant to a court of criminal jurisdiction, defendant's convictions shall be reinstated as of that date.
If the convictions are reinstated, the criminal court is then directed to conduct a resentencing hearing within 30 days, consistent with the unpublished portion of this opinion.
We concur:
Raye, P. J.
Butz, J.

See footnote *, ante .