Filed 3/26/25  P. v. Pardo CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C098996 |
| Plaintiff and Respondent, | (Super. Ct. No. 21FE015723) |
| v. | |
| SUSAN PARDO, | |
| Defendant and Appellant. | |

A jury found defendant Susan Pardo guilty of first degree burglary and assault with a deadly weapon.  On appeal, defendant contends the trial court prejudicially violated her constitutional right against self-incrimination when it admitted into evidence her statements to police made without a prior warning under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).  Because the People demonstrate any alleged error was harmless beyond a reasonable doubt, we affirm.

1

## FACTUAL AND PROCEDURAL BACKGROUND

Late on September 11, 2021, Rick H. was at a casino while Nancy I. watched his sons until he returned.  At approximately midnight, Nancy was sleeping on the couch when she awoke to defendant inside the house knocking on Rick's bedroom door calling for Rick's son.  Rick testified he had dated both defendant and Nancy before the incident but was not in a relationship with defendant at the time and had just started to "talk[]" to Nancy again after not dating her for seven years.  Nancy and defendant had never met before.  Defendant and Nancy each testified they were in a "girlfriend/boyfriend" relationship with Rick at the time of the incident.  Defendant testified Rick had invited her over, but Rick did not corroborate this testimony.

After banging on Rick's bedroom door, defendant asked Nancy if Rick was home.  Nancy said he was not and told defendant to leave.  Defendant left briefly and then returned to introduce herself, say "negative things" about Rick, and warn Nancy to stay away from him.  Nancy again told defendant to leave.

Defendant testified that Nancy physically pushed her out of the house, but Nancy denied this and testified she only "motioned [defendant] to . . . leave."  Home video surveillance showed defendant telling Nancy, "Be careful . . . .  Yeah yeah you should be careful," and Nancy responding, "[h]ead out the door.  [K]eep movin'. . . .  Just keep it movin'. . . .  I'm here with the boys, 'kay?"  Nancy then locked the previously unlocked door and went to Rick's bedroom.  Nancy called Rick and Rick told Nancy that defendant was not invited to his house.  After leaving Rick's house, defendant drove to her house and upon reflection decided to go back to Rick's house to confront Nancy as to why Nancy had pushed her.  Defendant grabbed a hammer "in case [Nancy] wanted to hurt [her]."

Before making her way back to Rick's house, defendant left Rick three voicemail messages at around 2:30 a.m.  One message provided in part:  "You're fucked.  That bitch is fucked.  I'm gonna break her fuckin' knees, and I'm gonna break yours. . . .  I'm

2

there at your house. You better . . . call the fuckin' cops. Have your mom come pick the kids up. . . . I'm gonna fuck you up. I'm gonna break her fuckin' legs. Don't let her come at me with something' 'cause guess what? . . . I'm not comin' with rocks and a sock. I'm comin' with fire." Another voicemail stated in part: "I'm gonna beat her . . . . She's gonna get her ass beat up." Defendant attributed these voicemails to having "too much to drink" that night.

Nancy testified she was on the phone with Rick in his bedroom when defendant walked in and immediately "jumped on [her] and hit [her] in [the] head with a hammer." Nancy struggled for the hammer and in the process was hit with the "claw part" of the hammer in her chest, back, and legs roughly six times. Nancy eventually took control of the hammer and hit defendant, which ended the altercation. Nancy called 911 and told dispatchers she was hit with a hammer while sleeping.

Defendant told a different story. Defendant testified she entered through Rick's unlocked front door and made her way to Rick's bedroom since Nancy was not on the couch. Once defendant entered the bedroom, Nancy "came towards [defendant], . . . pulled the hammer from [defendant's] sleeve and proceeded to beat [defendant] up and hit [defendant] with the hammer." Defendant did not "believe [she] fought back" but testified she "fought for [her] life" and "did not try to fight [Nancy] . . . like two people that engage and want to fight back and forth." Once defendant got away from Nancy, she went to her car and called 911.

Rick testified he was on the phone with Nancy during the altercation and heard Nancy say " '[o]h shit' " and " '[s]he's in my room,' " as well as sounds of a fight.

At around 4:14 a.m., Elk Grove Police Officer Evan Kwan was dispatched to the scene of the incident. Upon arrival, Officer Kwan observed a car parked on the street with defendant in the driver's seat. Defendant had a laceration and blood on her head.

Officer Kwan approached defendant's car, confirmed defendant's name, and twice requested she step out of the car. Defendant denied these requests because she felt as if

3

she could not comply. Officer Kwan asked where the hammer was, and defendant confirmed it was in the house. While struggling to get her driver's license out of her wallet, defendant asked to go to the hospital and Officer Kwan said she likely would go. Officer Kwan again asked defendant to get out of her car, to which defendant responded she would not. Officer Kwan made no further attempts to get defendant out of her car and indicated medical personnel would shortly arrive to tend to her injuries.

While waiting for medical personnel to arrive, Officer Kwan asked defendant what had happened and why she was there. Defendant explained she was there to see Rick, and Officer Kwan asked, "You came back with a hammer? . . . Why?" Defendant stated, "Because I wanted to just hit her. For her being rude to me. Nothing to do with him. I had it. She took it [from] me, and she hit me. And hit me and hit me, and I ran." Defendant further admitted she hit Nancy "because . . . [Nancy] pushed [her] out" and she "just wanted to hit [Nancy] in the leg because . . . she was really mean." Officer Kwan clarified defendant's statements and asked follow-up questions.

Once paramedics arrived, they began to treat defendant while Officer Kwan continued to ask questions about the altercation. Officer Kwan stayed within six feet of defendant while medical personnel treated her. Officer Kwan went with defendant in an ambulance to the hospital, during which defendant continued to answer Officer Kwan's questions.

Before trial, defendant filed a motion in limine to suppress body camera footage of her statements to Officer Kwan. The issue before the trial court was whether defendant was in custody for purposes of *Miranda*. The trial court denied defendant's motion and found a reasonable person absent defendant's injuries would feel free to leave considering the interview setting, Officer Kwan's conduct, and defendant's injury limitations.

At trial, the prosecution played an edited version of the body camera footage for the jury that included several incriminating statements from defendant to Officer Kwan.

4

During closing arguments, the prosecution relied on the totality of the evidence when making its case for conviction and, in rebuttal argument, emphasized how defendant's statements to police were inconsequential to its case. After 44 minutes of deliberation, the jury found defendant guilty of first degree burglary and assault with a deadly weapon. As to the burglary, the jury found true that defendant used a deadly weapon. The trial court imposed a sentence of five years for the burglary conviction and attached enhancement and stayed a three-year term pursuant to Penal Code section 654 for the assault with a deadly weapon conviction.

Defendant appeals.

DISCUSSION

Defendant argues her statements to Officer Kwan should have been suppressed because she was "subject[ed] to the equivalent of a custodial interrogation" in violation of *Miranda* and, "[h]ad her statements to the officer been excluded, . . . the jury could have concluded based on the testimonial evidence that [defendant] unlawfully entered Rick's house, not to commit an assault, but to commit a trespass, because there would have been no evidence of [defendant]'s alleged objective to specifically harm Nancy that morning with the hammer." (Boldface omitted.) We disagree defendant was prejudiced by the admission of her statements to Officer Kwan and thus do not need to decide whether defendant was subjected to a custodial interrogation under *Miranda*. Accordingly, we hold that any error in admitting evidence of defendant's statements to Officer Kwan was not prejudicial because the error was harmless beyond a reasonable doubt. (Cf. *People v. Thomas* (2011) 51 Cal.4th 449, 498; *People v. Cunningham* (2001) 25 Cal.4th 926, 994.)

Admission of a defendant's statements in violation of *Miranda* is subject to the harmless error standard of *Chapman v. California* (1967) 386 U.S. 18. (*People v. Sims* (1993) 5 Cal.4th 405, 447.) "That test requires the People 'to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' "

5

(*People v. Henderson* (2020) 9 Cal.5th 1013, 1029.) "Because confessions ' "[a]lmost invariably" will provide persuasive evidence of a defendant's guilt . . . , the improper admission of a confession is much more likely to affect the outcome of a trial than are other categories of evidence, and thus is much more likely to be prejudicial under the traditional harmless-error standard.' " (*Ibid*.)

Our Supreme Court recognized that "erroneous admission of a confession 'might be found harmless, for example, (1) when the defendant was apprehended by the police in the course of committing the crime, (2) when there are numerous, disinterested reliable eyewitnesses to the crime whose testimony is confirmed by a wealth of uncontroverted physical evidence, or (3) in a case in which the prosecution introduced, in addition to the confession, a videotape of the commission of the crime.' " (*People v. Henderson*, *supra*, 9 Cal.5th at p. 1030.) "This requires that we make a judgment about the significance of the statements to reasonable jurors, when measured against the other evidence considered by the jurors independently of those statements." (*People v. Roberts* (2017) 13 Cal.App.5th 565, 577.)

Here, defendant's confession added little to the probative value of the overall evidence and, contrary to defendant's argument, her testimony did not support a finding she lacked the felonious intent required of a burglary when considered with the rest of the evidence.[1] (Pen. Code, § 459 [burglary requiring entry into to the home with the intent to commit a felony].) Rather, it is " ' "clear beyond a reasonable doubt that a rational jury would have found . . . defendant guilty" ' " absent the confession, and in light of her testimony, because the independent evidence overwhelming supports the finding that

---

[1]     Defendant relies on her testimony to demonstrate prejudice. She fails to acknowledge that even if her statements to Officer Kwan were inadmissible for the prosecution's case in chief because of a *Miranda* violation, the statements would have still been admissible to impeach her testimony. (*Harris v. New York* (1971) 401 U.S. 222, 225-226.)

defendant intended to assault Nancy with a deadly weapon that morning. (*People v. Delgado* (2018) 27 Cal.App.5th 1092, 1109.)

First, as the People argue, defendant left voicemails that unequivocally expressed an intent to harm Nancy. Defendant specifically threatened to "beat" "[t]hat bitch," referring to Nancy. In another voicemail to Rick before the assault, defendant threatened to "break" Rick's and Nancy's knees. In that same voicemail, defendant told Rick he "better . . . call the fuckin' cops" because she planned to "fuck [Rick] up," break both of his legs, and "break [Nancy's] fuckin' legs." Defendant further suggested in the voicemail she planned to bring a weapon, stating, "I'm not comin' with rocks and a sock. I'm comin' with fire." We agree with the People that defendant's voicemails made less than two hours before the altercation show defendant intended to harm Nancy with a deadly weapon prior to her final return to Rick's house that morning.

Second, the People point to video evidence from Rick's home video surveillance that corroborates defendant's voicemail threats. The video surveillance captured defendant warning Nancy to "[b]e careful" before her subsequent voicemails. This further supports the conclusion defendant returned later that morning with the intent to commit a felonious act against Nancy and not merely to verbally confront her, as she testified. Akin to "videotape of the commission of [a] crime," the home surveillance footage and defendant's voicemails affirmatively express an intent to harm Nancy that morning, which would establish the requisite intent of burglary. (*People v. Cahill* (1993) 5 Cal.4th 478, 505; see Pen. Code, § 459.)

Third, as the People argue, Nancy's testimony and evidence related to her injuries also support a finding of defendant's felonious intent. After the altercation, Nancy told dispatchers that "[defendant] . . . hit her with a hammer" while "[she] was sleeping." In the same call, Nancy stated defendant told her, " 'I'm going to do this' " before "hit[ting] [her] up side [*sic*] the head." At trial, the jury was shown and Nancy testified to photographs of injuries to her arms, leg, chest, back, neck, and head. Elk Grove Police

7

Officer Essam Vigil testified to seeing some of these same injuries when she arrived to Rick's house that morning thereby further corroborating Nancy's testimony. Taken together, defendant's recorded statements before the altercation on the home surveillance footage and voicemails, along with Nancy's injuries and her 911 call, overwhelmingly support the jury's finding that defendant had the intent required for burglary.

Moreover, this is not a case where a defendant's confession was the "centerpiece of the prosecution's case in support of a conviction," but rather it was an additional piece that further corroborated all the other evidence presented at trial. (*People v. Cahill*, *supra*, 5 Cal.4th at p. 505; see *People v. Polk* (2010) 190 Cal.App.4th 1183, 1198 [holding that the defendant's statements were used only for impeachment purposes and the prosecution's closing argument relied mainly on other evidence to support its case].) The prosecution's closing argument relied partly on defendant's testimony and its inconsistency with the body camera footage. But the prosecution also pointed to Nancy's 911 call, the other three witnesses' testimony, Nancy's injuries, blood stains in the house, and defendant's voicemails to bolster its case for a conviction. The prosecution specifically relied on defendant's voicemails to argue that defendant's "intentions [were] clear that morning."

In fact, the prosecution's rebuttal closing argument addressed the strength of its case without a need for the body camera footage: "Let's assume we take away Officer Kwan's body cam and . . . defendant's confession to him. . . . We would have a 9-1-1 call right after an incident happened where [Nancy] is hit in the head with a hammer and calls 9-1-1. We'd have Nancy['s] . . . testimony. We'd have . . . defendant on scene . . . we'd have Nancy's injuries. . . . [¶] And that would be beyond a reasonable doubt." Defendant's intent was not proven solely by a confession, instead it was supported through witnesses, physical evidence, video surveillance, a 911 call, and unequivocal voicemail messages. It is also telling that the jury took only 44 minutes to find against defendant on both counts. Accordingly, we conclude the People have " 'prove[d] beyond

8

a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " (*People v. Elizalde* (2015) 61 Cal.4th 523, 542.)

## DISPOSITION

The judgment is affirmed.

/s/_____
ROBIE, J.

We concur:

/s/_____
HULL, Acting P. J.

/s/_____
KRAUSE, J.