Filed 12/28/20  P. v. Brown CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C079484 |
| Plaintiff and Respondent, | (Super. Ct. No. 13F02323) |
| v. | |
| DEMAREA MATTHEW BROWN, | |
| Defendant and Appellant. | |

Defendant Demarea Matthew Brown appeals following his conviction of kidnapping to commit rape (Pen. Code, § 209, subd. (b)(1); statutory section references that follow are to the Penal Code unless otherwise stated), two counts of forcible rape (§ 261, subd. (a)(2)), and one count of forcible oral copulation (§ 288a, subd. (c)(2)), all committed against victim J.P.  The jury found true an allegation that defendant kidnapped J.P. for the latter three offenses, which subjected defendant to mandatory sentencing of 25 years to life in prison under section 667.61.  The jury found defendant not guilty of a fifth count alleging oral copulation against a different victim, K.S.

On appeal, defendant contends the trial court erred in denying his motion in limine to exclude evidence of statements he made to police in violation of his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436).  Defendant also contends the trial court erred

1

by sentencing him to separate consecutive sentences without explaining a basis for a finding that defendant had a reasonable opportunity to reflect between separate sexual acts. (§§ 667.6, subd. (d), 667.61, subd. (d).) In supplemental briefing, defendant contends the trial court violated his right to due process by imposing fines and fees without first determining his ability to pay.

We reject these contentions and affirm the judgment.

FACTS AND LEGAL PROCEEDINGS

On November 25, 2012, at 8:00 p.m., victim J.P. went to the Olive Grove elementary school thinking she was meeting her former high school friend K.J. The two had reconnected on Facebook. K.J. indicated she was making good money as a prostitute and J.P. could do the same. J.P. did not take it seriously but agreed to meet and catch up with her old friend. As it turned out, the texts setting up the meeting came from a cell phone used by defendant.

The victim went to the school playground to wait for K.J. and was approached by a male, later identified as defendant. He said he had seen a female by an alley between two school buildings. The victim walked in that direction. Defendant followed and knocked her to the ground. He demanded her cell phone, but she said she lost it when he hit her.

Defendant, with his arm partially around the victim's throat, forced her to walk toward a building. She was afraid. He had her lie on her stomach on the ground, pulled off her shorts and underwear, and took off his pants. He touched her vagina with wet fingers. She told him to stop, but he told her to shut up, held her head face-down, lifted her by her waist and orally copulated her for about 20 seconds. He then rubbed his penis against her buttocks, anus, and vagina, but it did not go in. She told him to stop; he told her to shut up. He put his penis in her vagina and tried to make her move. She stayed still. He grunted with frustration. This lasted "maybe ten minutes or so." She described

2

three incidents of defendant's penis in her vagina. After one time, he pulled back, spread her buttocks, looked, licked his fingers, and put his penis in her vagina again. On one occasion, he stopped and did something else before putting his penis in her vagina. The whole time, he was behind her, and she was face-down on the ground, except when he pulled her to her knees to orally copulate her.

Then defendant stopped, stood up, and said he was sorry but had to do it because he was being blackmailed. They looked for her phone but could not find it.

The victim walked to a nearby house and told the occupants she had been raped. They called the police.

The victim received text messages referencing rape from a phone number she associated with K.J. but which police linked to defendant. A police sketch of the suspect also led police to defendant, though the victim did not identify him in a photo lineup.

Defendant admitted in a video-recorded interview at the police station (which we discuss *post*) that he had sex with the victim at the Olive Grove school. But he suggested the victim participated willingly, and it was a sort of job interview for the victim to join her friend K.J. in her career as a prostitute, in which defendant disclaimed involvement. Later in the interview, when asked why he would sexually assault someone, defendant said, "Just wanted to see if I could be that person  [¶] . . . [a] monster, I guess." When asked whether he was admitting to forcing J.P. to have sex, he said, "I guess so. I still don't say so but I guess so." He said J.P. did not say "no" and he did not force her to the ground; she fell. He admitted K.J. did not set up the encounter.

A sperm fraction generated from a vaginal swab of the victim was the same as defendant's reference profile, estimated to occur at random among unrelated individuals in 1 in 100 quintillion of the African-American population (defendant's race).

Evidence was adduced about a sexual offense against a different victim, but the jury found defendant not guilty and accordingly found "not true" the allegation of crimes committed against multiple victims.

The jury found defendant guilty of kidnapping to commit rape (§ 209, subd. (b)(1)), two counts of forcible rape (§ 261, subd. (a)(2)), and one count of forcible oral copulation (§ 288a, subd. (c)(2)). The jury found true an allegation that defendant kidnapped J.P. for the latter three offenses, which subjected defendant to mandatory sentencing of 25 years to life in prison under section 667.61.

The trial court sentenced defendant to consecutive terms of 25 years to life for the three sex offenses and a stayed term (§ 654) of life with possibility of parole for the kidnapping.

DISCUSSION

I

*Admissibility of Defendant's Statements to the Police*

Defendant contends the trial court erred in denying his motion to exclude evidence of statements he made to police. Defendant claims his initial police contact, in which he made inculpatory statements before being advised of his *Miranda* rights, was tantamount to an in-custody interrogation that required exclusion of statements he made before and after the *Miranda* advisement.

Around 7:00 a.m. on April 10, 2013, armed law enforcement officers executed a search warrant at the house where the 21-year-old defendant lived with his mother and grandmother. Detective Anthony Saika had defendant get dressed, asked to speak to him in private at the detective's "office" (the police station), and specified that defendant was not under arrest and would be given a ride home after the interview. The detective was 99 percent sure defendant was the perpetrator.

In the recorded interview at the police station, the detective said he did not interview defendant at home so as not to disrupt or upset his mother. The detective said, "Um, like I said over at the house, you're not under arrest. Okay? You're free to leave at any time." Defendant said, "Mm-hm." The detective said, "That door ain't locked.

4

Okay? You say time out (Tony) we're done, I take you back to your house. That was the deal and that's what I told you back at the house, right?" Defendant said, "Yeah."

At the station, the detective asked if defendant followed the news, and defendant said he now knew this was about J.P., because he heard there was a police sketch in the news that looked like him. Defendant said he had sex with J.P. at the Olive Grove school. Defendant agreed the sketch looked like him but said there was no sexual assault. He previously had sex with K.J., who he heard was now having sex for money in Las Vegas and was trying to get J.P. to go to Vegas.

Defendant was "kind of the middle guy." "So hooking up with me was gonna get [J.P.] the credit or the whatever to make sure that she could do what [K.J.] does, I guess." Defendant chose Olive Grove as the meeting place. Defendant explained to J.P. before the sex that he had "nothing to do with it. I'm just this one time whoop de whoop de woo," and then "we hooked up and I was like, I'm sorry I have to do this, I understand. And then that was it. She knew what we were there for." When asked why he apologized to J.P., defendant said he was a psychology major and could tell something was wrong. He assumed it was because she did not want to have sex with males and preferred females.

Defendant denied being K.J.'s "pimp[]."

At the police station, a different detective spoke to defendant about an unrelated case. When Detective Saika returned to "finish up," defendant asked to use the bathroom again. The detective said okay but noted ,"You went twice man." When they resumed the interview, defendant "guessed" he should not "leave the country" for a job in Alaska that he might have lined up. The detective acknowledged the district attorney would probably want defendant arrested.

Detective Saika said he would give defendant a ride home and told him to wait in the lobby.

5

After defendant waited in the lobby for 15 or 20 minutes, the detective said he had been discussing with his supervisor that defendant had stated during the interview that he would kill himself rather than stay in prison for more than five years. Defendant said he was not going to hurt himself now; he would have to know what the charges were. The detective suggested the district attorney may decide not to charge anything, which defendant rejected because "I confessed." Defendant "kinda know[s] how it goes" because he was at that time a criminal justice major (with a double major in psychology).

The detective drove defendant home at 11:25 a.m. and arranged to have defendant's grandmother secure her gun. The detective requested a surveillance team to arrest defendant when he left the house due to concern he might harm himself, but defendant had already left the house in his own car.

Defendant returned from a liquor store about 15 minutes later and was arrested and advised of his *Miranda* rights. When told he was under arrest for sexual assault, defendant asked why ("So it was okay until what?"). Detective Saika said it was due to comments about defendant hurting himself. In this post-*Miranda* statement, defendant again acknowledged putting his penis in the victim's vagina and said it was possible he put his mouth on her vagina; he did not remember but there was a 50-50 chance he did. He did remember that "she was on her stomach bent - bent over and I did stick it in her, and then it wasn't really working for the most part, so then she just rearranged her body so I could stick it in --." He admitted the victim screamed. He was not blackmailed to do it, as he had told the victim. He found the phone she dropped, which he wanted in order to delete his phone number.

In a second post-arrest statement audio-recorded during the drive to the jail, defendant admitted he planned to have J.P. meet him at the school knowing that she thought she was communicating with K.J.

The trial court ruled there was no *Miranda* violation, and all of defendant's statements were voluntary. For the first interview which lasted about three hours,

6

defendant was not in custody. He was told he was not under arrest; he was not handcuffed or physically restrained; the door was unlocked; it was a one-on-one conversation that was not coercive or confrontational in tone; police gave defendant a ride home; and he then drove himself to the liquor store. The first statement was voluntary, based on the court's having reviewed the tapes and the foregoing circumstances. Although seven officers executed the search warrant at the house, defendant was soon transported to the station where only one detective questioned him and did so in a noncoercive manner, with no threats or promises of leniency.

The court ruled defendant's second and third statements were voluntary under *Oregon v. Elstad* (1985) 470 U.S. 298 [84 L.Ed.2d 222], which held that admissibility of any subsequent *Mirandized* statement turns on whether it is knowingly and voluntarily made. The court found no evidence that the police have a policy of using a two-step process to avoid *Miranda*, or that the detective deliberately engaged in a two-step strategy to avoid *Miranda*. Defendant's talk of self-harm led to his arrest. The questioning was conversational, not confrontational. There were no threats or pressure or promises or leniency. There was not a continuity of interrogation; the first and second interviews were separated by about four hours, during which defendant was taken home, left home in his own car, returned home, and was re-transported back to the police station. While there was some overlap in content, the second interview added details and questions about different aspects of the case. The interrogator did not treat the second round as continuous to the first.

The trial court accordingly denied defendant's motion in limine to exclude the evidence.

7

A. *The First Interrogation*

    1. *Miranda*

When we review a trial court's ruling on a claimed *Miranda* violation, " 'we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. We independently determine from [those facts] whether the challenged statement was illegally obtained.' " (*People v. Gamache* (2010) 48 Cal.4th 347, 385, quoting *People v. Cunningham* (2001) 25 Cal.4th 926, 992; *People v. Delgado* (2018) 27 Cal.App.5th 1092, 1104 (*Delgado*).) Though we apply de novo review to the facts, we give great weight to the considered conclusions of the trial court that has previously reviewed the same evidence. (*People v. Camino* (2010) 188 Cal.App.4th 1359, 1370-1371.)

*Miranda* applies only to *custodial* interrogations, and custodial status arises if a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way." (*Miranda, supra*, 384 U.S. at p. 444; *People v. Elizalde* (2015) 61 Cal.4th 523, 530-531, fns. omitted.) "Custody consists of a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest. (*People v. Leonard* (2007) 40 Cal.4th 1370, 1400; *People v. Boyer* (1989) 48 Cal.3d 247, 271 [disapproved on another ground in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1].) When there has been no formal arrest, the question is how a reasonable person in the defendant's position would have understood his situation. (*Boyer*, at p. 272.)" (*People v. Moore* (2011) 51 Cal.4th 386, 395; *Delgado, supra*, 27 Cal.App.5th at p. 1104.)

"Whether a person is in custody is an objective test: the pertinent inquiry is whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. (*People v. Leonard, supra*, 40 Cal.4th at p. 1400.) The totality of the circumstances is considered and includes '(1) whether the suspect has been formally arrested; (2) absent formal arrest, the length of the detention; (3) the location;

8

(4) the ratio of officers to suspects; and (5) the demeanor of the officer, including the nature of the questioning.' (*People v. Forster* (1994) 29 Cal.App.4th 1746, 1753.) Additional factors are whether the officer informed the person he or she was considered a witness or suspect, whether there were restrictions on the suspect's freedom of movement, whether the police were aggressive, confrontational, and/or accusatory, and whether the police used interrogation techniques to pressure the suspect. (*People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1162.)" (*People v. Davidson* (2013) 221 Cal.App.4th 966, 971-972.)

Here, the record amply supports the trial court's determination that defendant was not in custody during the first interview. Defendant was told he was not under arrest; he was not handcuffed or physically restrained; the door was unlocked; it was a one-on-one conversation that was not coercive or confrontational in tone; and he was left on his own in the lobby for 15 minutes or so before the detective gave him a ride home.

Although the detective believed defendant was the culprit at the inception of the interview, that circumstance does not render the interview a custodial interrogation. (*California v. Beheler* (1983) 463 U.S. 1121.)

Defendant was not in custody during the first interview.

### 2. *Voluntariness*

"Where the voluntariness of a confession is raised on appeal, the reviewing court should examine the uncontradicted facts to determine independently whether the trial court's conclusion of voluntariness was proper. If conflicting testimony exists, the court must accept that version of events that is most favorable to the People to the extent it is supported by the record." (*Delgado, supra*, 27 Cal.App.5th at p. 1107.)

The question is whether the defendant's will was overborne at the time he confessed, and the burden is on the prosecution to show voluntariness by a preponderance of the evidence. (*Delgado, supra*, 27 Cal.App.5th at p. 1107.) A confession is

9

involuntary under federal and state guarantees of due process if it has been extracted by any sort of threats or violence, or obtained by any direct or implied promises, however slight, or by the exertion of any improper influence. (*Ibid.*) Coercive police conduct is a necessary predicate to a finding that a confession was involuntary. (*Ibid.*)

Here, there were no threats or violence or promises or improper influence. Although seven officers executed the search warrant at the house, defendant was soon transported to the station where only one detective questioned him about J.P. and did so in a noncoercive manner, with no threats or promises of leniency. After defendant admitted he was the one who had sex with J.P. that night, the detective said he was there to "advocate" for defendant, to tell his side of the story. Defendant said he wanted to go home. The detective said he could go home but first had to give saliva for a DNA test authorized by the search warrant. Defendant acknowledged police would find his DNA on the victim and then engaged in further conversation, asking whether the victim had bruises. The detective said he was tired but would like to know why defendant did it, if defendant wanted to tell. Defendant said he just wanted to see if he could be a person who could live with the remorse of committing a crime. None of this rises to the level of improper influence.

Moreover, defendant expressed familiarity with the criminal justice system and the significance of his admissions. When defendant said, "I ain't spendin' 15 years in prison," and the detective told him to slow down, defendant said, "I am a criminal justice major. I kinda know how it goes." He "gotta know what the charges are first" before he decided whether to hurt himself, and he dismissed the detective's suggestion that maybe no charges would be filed with the retort, "You got a confession . . . I confessed." Defendant also acknowledged that he knew his interview was being videotaped.

We conclude defendant was not in custody for *Miranda* purposes during the first interview, there was no *Miranda* violation, and his statements were voluntary.

10

B.  *The Second and Third Interrogations*

Defendant's subsequent post-*Miranda* statements were also voluntary and admissible.

Defendant invokes *Missouri v. Seibert* (2004) 542 U.S. 600 [159 L.Ed.2d 643] (*Seibert*), which held that, absent a deliberate police policy or practice to evade *Miranda* through a two-step process, a subsequent voluntary "warned" confession after *Miranda* advisements is admissible notwithstanding a prior unwarned confession.  (*Camino, supra*, 188 Cal.App.4th 1359.)  Since we have concluded there was no *Miranda* violation and the voluntary confession at the first interview was admissible, *Seibert* is of little effect here but, in any event, defendant fails to show a deliberate attempt to evade *Miranda*.

We review for substantial evidence the trial court's finding that there was no subjective plan to evade *Miranda*.  (*Camino, supra*, 188 Cal.App.4th at pp. 1364, 1372.)

We reviewed the legal principles in *People v. Delgado, supra,* 27 Cal.App.5th 1092:

*Oregon v. Elstad, supra,* 470 U.S. 298 rejected a "cat out of the bag" approach dictating that once an unwarned statement is made a subsequent warned statement is inadmissible because a person cannot effectively take back what she or he has said. *Elstad* instead held that "though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made."  (*Oregon v. Elstad, supra*, 470 U.S. at p. 309.)

There were multiple opinions in *Seibert*, but a majority agreed with the opinion by Justice Kennedy.  (See *Camino, supra*, 188 Cal.App.4th at p. 1370 & fn. 5.)  Justice Kennedy's opinion said that *Elstad* reflects a balanced and pragmatic approach to enforcement of the *Miranda* warning, because an officer may not realize that a suspect is in custody and warnings are required, but in Seibert's case the police used a two-step

11

questioning technique based on a deliberate violation of *Miranda*. (*Seibert, supra*, 542 U.S. at p. 620, opn. of Kennedy, J.) They withheld the *Miranda* warning to obscure both the practical and legal significance of the admonition when finally given. (*Ibid*.) When an interrogator uses this deliberate two-step strategy, predicated upon violating *Miranda* during an extended interview, post-warning statements that are related to the substance of prewarning statements must be excluded absent specific, curative steps. (*Id.* at p. 621.)

Here, the record shows defendant's post-*Miranda* statements (like his pre-*Miranda* statements) were voluntary. There were no threats, violence, promises, or any kind of coercive conduct by the police by which defendant's will was overborne. To the contrary, he scoffed at the detective's suggestion that maybe the district attorney would not file charges.

We conclude admission into evidence of all of defendant's statements to the police was proper.

II

*Consecutive Sentences*

Defendant argues consecutive sentencing on the oral copulation count and two rape counts was improper, because the trial court did not expressly state reasons for finding that the crimes occurred on "separate occasions," i.e., that defendant had a "reasonable opportunity to reflect" on his actions and nevertheless resumed the behavior. (§§ 667.6, 667.61.) We reject the contention.

The probation report recommended consecutive sentences under California Rules of Court, rule 4.425(a)(2) (Rule), because "The crimes . . . involved separate acts of violence or threats of violence . . . ."

The trial court expressed its intent "to follow the probation officer's recommendation" and impose consecutive sentences because there were separate acts of

12

violence. Defendant, then acting in propria persona, objected on the ground that he did not believe there were separate acts of violence. The court nevertheless imposed consecutive sentencing "because the crimes involved separate acts of violence or threats of violence."

Defendant contends the trial court erred in imposing consecutive terms without stating reasons. However, the court did state its reason, i.e., that the crimes involved separate acts of violence or threats of violence. Defendant argues more was required under sections 667.6 and 667.61, i.e., express findings that the defendant had reasonable opportunity to reflect between acts. Defendant fails to meet his burden on appeal to show he adequately raised this point in the trial court, or that express findings of reasonable opportunity to reflect were required.

Section 667.61 provides that any person convicted of rape or oral copulation who kidnapped the victim with movement that substantially increased the risk of harm (*id*. subds. (a), (c)(1) & (7), and (d)(2)) "shall be punished by imprisonment in the state prison for 25 years to life." (*Id*. subd. (a).) Subdivision (*i*) of the same statute states that, for those specified offenses, the court "shall impose a consecutive sentence for each offense that results in a conviction under this section if the crimes . . . involve the same victim on separate occasions as defined in subdivision (d) of Section 667.6."

In turn, section 667.6, subdivision (d), provides in part: ". . . In determining whether crimes against a single victim were committed on separate occasions under this subdivision, the court shall consider whether, between the commission of one sex crime and another, the defendant had a reasonable opportunity to reflect upon his or her actions and nevertheless resumed sexually assaultive behavior. Neither the duration of time between crimes, nor whether or not the defendant lost or abandoned his or her opportunity to attack, shall be, in and of itself, determinative on the issue of whether the crimes in question occurred on separate occasions. . . ."

13

Rule 4.426(a)(2) states that "If [violent sex crimes] were committed against a single victim, the sentencing judge must determine whether the crimes were committed on separate occasions. In determining whether there were separate occasions, the sentencing judge must consider whether, between the commission of one sex crime and another, the defendant had a reasonable opportunity to reflect on his or her actions and nevertheless resumed sexually assaultive behavior. A full, separate, and consecutive term must be imposed for each violent sex offense committed on a separate occasion under section 667.6(d)."

Rule 4.406(b) requires a statement of reasons for imposing consecutive sentences generally. That requirement is satisfied if the judge states "in simple language the primary factor or factors that support the exercise of discretion. The statement need not be in the language of the statute or these rules. It must be delivered orally on the record. The court may give a single statement explaining the reason or reasons for imposing a particular sentence or the exercise of judicial discretion, if the statement identifies the sentencing choices where discretion is exercised and there is no impermissible dual use of facts." (Rule 4.406(a).)

"Relevant factors enumerated in these rules must be considered by the sentencing judge and will be deemed to have been considered unless the record affirmatively reflects otherwise." (Rule 4.409.)

Thus, the trial court's determination of "separate occasions" is an adequate statement of reasons, and we deem the court to have considered "reasonable opportunity to reflect" as a factor in that determination, because the record does not affirmatively reflect otherwise.

To the extent defendant would require the trial court to state reasons for finding a reasonable opportunity to reflect, such contention is forfeited by failing to object at the time sentence was imposed. (*People v. Boyce* (2014) 59 Cal.4th 672, 730-731.)

14

Moreover, defendant fails to show that the court was required to make express findings regarding opportunity to reflect.  Defendant cites *People v. Irvin* (1996) 43 Cal.App.4th 1063, 1072 (*Irvin*).  There, however, the appellate court called for a factual explanation upon remand if the trial court upon remand persisted in consecutive sentencing, because the appellate court "doubt[ed] any reasonable trier of fact could find that every act or offense was committed on a separate occasion."  (*Id*. at p. 1071.)

We are thus left with the rule:  "Once a trial judge has found under section 667.6, subdivision (d), that a defendant committed offenses on separate occasions, we may reverse only if no reasonable trier of fact could have decided the defendant had a reasonable opportunity for reflection after completing an offense before resuming his assaultive behavior."  (*People v. Garza* (2003) 107 Cal.App.4th 1081, 1092.)

Here, we cannot say that no reasonable trier of fact could have decided that defendant had a reasonable opportunity to reflect.

Defendant's own statement to police supports a finding of opportunity to reflect between separate occasions of defendant inserting his penis in the victim's vagina, because "it wasn't really working."  He said, "she was on her stomach bent - bent over and I did stick it in her, and then it wasn't really working for the most part, so then she just rearranged her body so I could stick it in --."  Defendant had reasonable opportunity to reflect because "it wasn't really working."  Although he claimed the victim rearranged her body (in an obvious attempt to minimize his crime), the victim testified he was manipulating her body.  Her testimony confirmed that things were not happening as defendant hoped, and he had to re-assess and think of different approaches.  Thus, the victim testified he then rubbed his penis against her buttocks, anus, and vagina, but it did not go in.  She told him to stop; he told her to shut up.  He put his penis in her vagina and tried to make her move.  She stayed still.  He grunted with frustration.  This lasted "maybe ten minutes or so."  She described three incidents of defendant's penis in her vagina.  After one time, he pulled back, spread her buttocks, looked, licked his fingers,

15

and put his penis in her vagina again. On one occasion, he stopped and did something else before putting his penis in her vagina. The whole time, he was behind her, and she was face-down on the ground, except when he pulled her to her knees to orally copulate her.

A finding of separate occasions does not require a change in location or an obvious break in the perpetrator's behavior; a forcible violent sexual assault made up of varied types of sex acts against a victim is not necessarily one sexual encounter. (*Irvin, supra*, 43 Cal.App.4th at p. 1071.) We recognize though that a change of positions between different sexual acts is insufficient by itself to prove reasonable opportunity to reflect, especially if the change is accomplished in a matter of seconds. (*People v. Pena* (1992) 7 Cal.App.4th 1294, 1316; *People v. Corona* (1988) 206 Cal.App.3d 13, 18.)

In *Garza*, *supra*, we affirmed the trial court's finding of separate occasions because the defendant had an adequate opportunity to reflect between the time he inserted his finger in the victim's vagina and the commission of the first rape -- an interval during which the defendant began to play with the victim's chest, put his gun on the back seat, pulled the victim's legs around his shoulder, and forced his penis inside her vagina. (*Id*. 107 Cal.App.4th at pp. 1092-1093.)

We conclude defendant fails to show grounds for resentencing.

III

*Fines, Fees, Assessments*

We granted defendant's request for supplemental briefing on his new contention, based on new case law (*People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*)), that the trial court violated his due process rights by imposing fines, fees, and assessments without determining his ability to pay. Defendant claims *Dueñas* states a newly-declared constitutional rule compelling reversal unless and until the prosecution proves defendant has the present ability to pay. We reject the contention.

16

The trial court imposed on defendant a $120 court facilities assessment (Gov. Code, § 70373), $160 court operations assessment (§ 1465.8), $331.98 booking fee and $60.18 jail classification fee (Gov. Code, § 29550.2), $702 presentence report (§ 1203), and a $5,000 restitution fine (§ 1202.4) and a suspended matching parole revocation restitution fine (§ 1202.45).

In the trial court, defendant did not claim inability to pay. The record shows he is a young man (24 years old at sentencing) with a job history (newspaper delivery, arcade worker, house painter, and security guard at a homeless shelter). His 75-year prison sentence obviously affects his earning potential. Prison wages for inmates range from $12 to $56 a month, half of which is deducted for outstanding fines. (*People v. Jones* (2019) 36 Cal.App.5th 1028.) Defendant suggests his convictions limit his employment opportunities in prison.

The bulk of the amount imposed by the court, $5,000, is for the restitution fine. Since this exceeded the statutory minimum, defendant could have asserted inability to pay. Thus, a trial court must impose a section 1202.4 restitution fine on the defendant to compensate the victim "unless it finds compelling and extraordinary reasons for not doing so and states those reasons on the record. A defendant's inability to pay shall not be considered a compelling and extraordinary reason not to impose a restitution fine. Inability to pay may be considered only in increasing the amount of the restitution fine in excess of the minimum fine [now $300] . . . ." (§ 1202.4, subd. (c).) In setting the amount of the fine in excess of the minimum, "the court shall consider any relevant factors, including, but not limited to, the defendant's inability to pay, the seriousness and gravity of the offense and the circumstances of its commission, any economic gain derived by the defendant as a result of the crime, the extent to which any other person suffered losses as a result of the crime, and the number of victims involved in the crime. . . . Consideration of a defendant's inability to pay may include his or her future earning capacity. A defendant shall bear the burden of demonstrating his or her inability to pay.

17

Express findings by the court as to the factors bearing on the amount of the fine shall not be required. A separate hearing for the fine shall not be required." (§ 1202.4, subd. (d).)

Here, the court imposed more than the minimum fine, and thus defendant had the opportunity to demonstrate inability to pay, had he raised the point in the trial court. The traditional rule is that the failure to raise such a fact-specific matter in the trial court forfeits the challenge. (E.g., *People v. McCullough* (2013) 56 Cal.4th 589, 590; *People v. Nelson* (2011) 51 Cal.4th 198, 227.) Even a constitutional claim is forfeited if it is fact-specific. (*People v. Baker* (2018) 20 Cal.App.5th 711, 720 [Eighth Amendment claim of cruel/unusual punishment is fact-specific and is therefore forfeited if not raised in the trial court].)

The trial court in *Dueñas* imposed the minimum restitution fine on an indigent defendant, but the appellate court, applying due process principles, broadly held that "although . . . section 1202.4 bars consideration of a defendant's ability to pay unless the judge is considering increasing the fee over the statutory minimum, the execution of *any* restitution fine imposed under this statute must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine." (*Dueñas, supra*, 30 Cal.App.5th at p. 1164, italics added.) *Dueñas* also said due process required an ability-to-pay hearing before imposing court facilities and operations assessments. (*Ibid.*) The court relied on authority recognizing "the deleterious impact of increased court fees on indigent people" that deny people access to the courts or the justice system. (*Id.* at p. 1165.) The court indicated it would reach the same result under the federal and state constitutional prohibitions against "excessive fines." (*Id.* at p. 1171, fn. 8.)

Here, the parties dispute whether *Dueñas* allows defendant to challenge ability to pay for the first time on appeal. We agree with *People v. Gutierrez* (2019) 35 Cal.App.5th 1027 (*Gutierrez*), in which the Fourth District, Division One, addressing a $10,000 restitution fine, noted a split among appellate courts as to the forfeiture issue,

18

but concluded that, even before *Dueñas*, "a defendant had every incentive to object to imposition of a maximum restitution fine based on inability to pay because governing law as reflected in [section 1202.4] expressly permitted such a challenge." (*Gutierrez,* at p. 1033.) Accordingly, "even if *Dueñas* was unforeseeable (a point on which we offer no opinion), under the facts of this case [defendant] forfeited any ability-to-pay argument regarding the restitution fine by failing to object." (*Gutierrez,* at p. 1033.) The court added the same was true for the lesser fees for court security, etc., under section 1465.8 and Government Code section 70373. "As a practical matter, if [defendant] chose not to object to a $10,000 restitution fine based on inability to pay, he surely would not complain on similar grounds regarding an additional $1,300 in fees." (*Gutierrez,* at p. 1033.)

We agree with this reasoning and reach the same conclusion here. Because the trial court imposed a restitution fine above the statutory minimum and defendant had a statutory right to object, his failure to do so resulted in a forfeiture of the issue on appeal. And since he chose not to object to the $5,000 restitution fine based on inability to pay, he surely would not complain on similar grounds to the additional $1,374 (our tally) or $1,554 (defendant's tally).

We alternatively agree with J. Benke's opinion concurring in part with the majority in *Gutierrez, supra,* 35 Cal.App.5th 1027, which questioned whether *Dueñas* could be so easily dismissed but instead rejected *Dueñas* as fundamentally flawed.

First, *Dueñas* by judicial fiat inserted language -- i.e., "present" ability to pay -- into statutes where no such language existed. *Dueñas* concluded the assessment provisions of Government Code section 70373 and section 1465.8, "if imposed without a determination that the defendant is able to pay, are thus fundamentally unfair; imposing these assessments upon indigent defendants without a determination that they have the *present* [italics added] ability to pay violates due process under both the United States Constitution and the California Constitution. (U.S. Const. 14th Amend.; Cal. Const., art.

19

I, § 7.) These fees, assessed as part of a larger statutory scheme to raise revenue to fund court operations, should be treated no differently than their civil counterparts enacted in the same legislation and imposed only on those with the means to pay them. [Citation.]" (*Dueñas, supra*, 30 Cal.App.5th at pp. 1168-1169.) J. Benke observed that, whereas the Legislature elsewhere specified "present" ability to pay (e.g., § 987.8 [determine after conclusion of a case, whether criminal defendant must reimburse cost of court-appointed counsel]), no such language appears in sections 1202.4, 1465.8, or Government Code section 70373. (*Gutierrez, supra*, 35 Cal.App.5th at p. 1038, conc. opn. by Benke, J.) And, by adding the word "present" to the ability-to-pay analysis with respect to the restitution fine, *Dueñas* ignored section 1202.4, subdivision (d), which states the exact opposite: " 'Consideration of a defendant's inability to pay may include his or her *future earning capacity*.' (Italics added.) A court lacks the power to rewrite a statute either so as to make it conform to a presumed intention that is not stated, or to ignore a statute's plain and unambiguous language." (*Gutierrez,* at p. 1038, conc. opn. by Benke, J.)

A second flaw is that *Dueñas* relied on authorities concerning fees to "access" the courts, whereas the fees, assessments, and fines at issue here do not deny criminal defendants "access" to the courts. (*Gutierrez, supra*, 35 Cal.App.5th at p. 1039, conc. opn. of Benke, J.) As seen by our addition of italics to *Dueñas*'s discussion: "The Legislature has declared that 'our legal system cannot provide "equal justice under law" unless all persons have *access* to the courts without regard to their economic means. California law and court procedures should ensure that court fees are not a barrier to court *access* for those with insufficient economic means to pay those fees.' (Gov. Code, § 68630, subd. (a).) The Legislature has also declared that 'fiscal responsibility should be tempered with concern for litigants' rights to *access* the justice system. The procedure for allowing the poor to *use* court services without paying ordinary fees must be one that applies rules fairly to similarly situated persons, is accessible to those with limited knowledge of court processes, and does not delay *access* to court services.' (Gov. Code,

20

§ 68630, subd. (b).)  [¶]  Accordingly, the Legislature has provided for fee waivers for indigent litigants at the trial and appellate court levels that excuse them from paying fees for the first pleading or other paper, and other court fees and costs, including assessments for certain court investigations.  (Gov. Code, § 68631.)  Government Code section 68632 grants permission to proceed without paying costs to those receiving certain public assistance benefits, to those whose monthly income is 125 percent or less of government poverty guidelines, and to those who 'cannot pay court fees without using moneys that normally would pay for the common necessaries of life for the applicant and the applicant's family.'  (Gov. Code, § 68632, subds. (a)-(c).)

"While this protective mechanism lessens the disproportionate burden that these fundraising fees present to indigent litigants in the civil context, the Legislature neither instituted nor rejected a corresponding safeguard for assessments attached to a criminal conviction.  Both Government Code section 70373 and . . . section 1465.8 are silent as to the consideration of a defendant's ability to pay in imposing the assessments."  (*Dueñas, supra*, 30 Cal.App.5th at pp. 1165-1166, italics added, fn. omitted.)

*Dueñas* also cited *Griffin v. Illinois* (1956) 351 U.S. 12 [100 L.Ed. 891], which concluded that due process and equal protection guaranteed an indigent criminal defendant a free transcript of trial proceedings in order to provide that defendant with *access* to a court of review, where he would receive an adequate and effective examination of his criminal conviction.  (*Id*. at p. 16.)

As noted by J. Benke, *Dueñas* misplaced reliance on authorities where indigency would deny a person *access* to the courts and justice system.  In contrast to those charges, imposition of the fees, assessments, and fines at issue here do not implicate *access* to the courts or the justice system.  (*Gutierrez, supra*, 35 Cal.App.5th at pp. 1035-1036, conc. opn. of Benke, J.)

We conclude that no general due process or equal protection authority required the trial court to conduct a pre-assessment hearing of ability to pay before imposing the fines, fees, and assessments on defendant.

As indicated, *Dueñas* said in a footnote that imposing the restitution fine without determining ability to pay would also violate the ban on "excessive fines" in the federal and state Constitutions, because the due process and excessive fines analyses are similar. (*Dueñas, supra*, 30 Cal.App.5th at p. 1171, fn. 8.) In *Gutierrez*, J. Benke, without mentioning the *Dueñas* footnote, said the claim regarding ability to pay is more appropriately analyzed under the excessive fines clause -- which considers ability to pay as well as other factors -- and the fines and fees were not excessive. (*Gutierrez, supra*, 35 Cal.App.5th at p. 1040, conc. opn. by Benke, J.) We need not comment because, regardless whether due process and excessive fines analyses are similar, an excessive fines claim under the Eighth Amendment or California Constitution, article 1, section 17, is not new; it has long been available to defendants and would clearly be forfeited in our case by defendant's failure to raise it in the trial court (or on appeal). (E.g., *People v. McCullough, supra,* 56 Cal.4th at pp. 590-591 [defendant forfeited challenge to booking fee by failing to raise it in trial court]; *People v. Baker, supra,* 20 Cal.App.5th at p. 720 [Eighth Amendment claim is fact-specific and is therefore forfeited if not raised in the trial court, citing *People v. DeJesus* (1995) 38 Cal.App.4th 1, 27].)

We see no basis for reversal of the fines, fees, or assessments.

## DISPOSITION

The judgment is affirmed.

_____

HULL, Acting P. J.

I concur:


_____

DUARTE, J.

ROBIE, J., Concurring and Dissenting.

I concur fully in all parts of the Discussion except part III addressing defendant's argument that *Dueñas* calls into question the imposition of the $5,000 restitution fine, the $160 court operations assessment, the $120 court facilities assessment, the $331.98 booking fee, the $60.18 jail classification fee, and the $702 presentence report fee without first determining his ability to pay. (*People v. Dueñas* (2019) 30 Cal.App.5th 1157.) As to part III, I concur and dissent.

I concur in the majority's conclusion that defendant's challenge to the restitution fine is forfeited because an objection must be made in the trial court to preserve a challenge to the imposition of a restitution fine in excess of the mandatory minimum on appeal, and defendant failed to do so. (*People v. Nelson* (2011) 51 Cal.4th 198, 227.) I also concur in declining to consider defendant's argument as to the jail classification and booking fees, imposed pursuant to Government Code section 29550.2, for the same reason. (*People v. McCullough* (2013) 56 Cal.4th 589, 590-591 [failure to contest such fees when the court imposes them forfeits the right to challenge on appeal].)

I dissent to the majority's conclusion that defendant's inability to pay claim as to the remaining assessments and fee was forfeited. I agree that, as stated in *Castellano*, a trial court is required to determine a defendant's ability to pay only if the defendant raises the issue, and the defendant bears the burden of proving an inability to pay. (*People v. Castellano* (2019) 33 Cal.App.5th 485, 490.) In the absence of authority invalidating the challenged mandatory assessments and fee on inability to pay at the time the trial court imposed it, however, defendant could not have reasonably been expected to challenge the trial court's imposition thereof. (*People v. Welch* (1993) 5 Cal.4th 228, 237 ["[r]eviewing courts have traditionally excused parties for failing to raise an issue at trial where an objection would have been futile or wholly unsupported by substantive law then in existence"].) I further disagree with the majority's alternative conclusion that *Dueñas* was wrongly decided. I agree with *Dueñas* that principles of due process would preclude

1

a trial court from imposing the fine and assessments at issue if a defendant demonstrates he or she is unable to pay them.  (*People v. Dueñas*, *supra*, 30 Cal.App.5th at p. 1168.)

I believe a limited remand under *Dueñas* is appropriate to permit a hearing on defendant's ability to pay the court operations assessment, court facilities assessment, and the presentence report fee because his conviction and sentence are not yet final.  (See *People v. Castellano*, *supra*, 33 Cal.App.5th at pp. 490-491.)


/s/ _____
Robie, J.